## ABRAHAM *v.* NORTH GERMAN INS. Co.

*(Circuit Court, N. D. Iowa, E. D.* December 30, 1889.)

**1. INSURANCE—REFORMATION OF POLICY.**
Where the agent of an insurance company agrees to insure property for the benefit and protection of the owner, and receives the consideration for such contract of insurance, but, in writing out the policy, fails to make it express the real contract entered into, equity will reform the policy, if the company is bound to make good the contract which the agent in fact made in its behalf.[1]

**2. SAME—AGENTS.**
Where an insurance company issues a policy of insurance in pursuance of a contract made by one assuming to be its agent, it is estopped to deny the agency.

**3. SAME.**
The company is bound, not only by the contract appearing upon the face of the policy, but by that actually made by such agent.

In Equity. Bill to reform policy of insurance.
*Blake & Hormel* and *Chas. A. Clark,* for complainant.
*Henderson, Hurd, Daniels & Kiesel,* for defendant.

SHIRAS, J. From the evidence in this case it appears that in 1883 the complainant owned an elevator building at Newhall, Iowa, together with the machinery therein, the same being placed on the land of the Chicago, Milwaukee & St. Paul Railroad Company; the same being used for the reception and forwarding of grain upon said railway. The business was carried on in the name of H. Eyler, and the title of the property was ostensibly in him, but in fact the property and business belonged to complainant; Eyler being merely an employe, receiving a fixed salary of $50 per month. In September, 1882, a policy of insurance was issued upon the property by the Council Bluffs Insurance Company, through its agent, George Snyder, then residing at Cedar Rapids, Iowa; the written portion of the policy being as follows:

"$2,500. H. Eyler, Newhall. $1,300 on his two-story frame, shingle roofed elevator, situated on railroad ground of the C., M. & St. P. R. R. Co., in the town of Newhall, Benton county, Iowa; $200 on his steam-engine contained therein; $1,000 on his grain therein. Loss, if any, payable to G. G. Abraham, mortgagee, as his interest may appear."

On the 2d day of January, 1883, a policy was issued by the North German Insurance Company, the written portion of which is as follows:

"$1,000. H. Eyler, Newhall, Benton county, Iowa. One thousand on his two-story frame, shingle roofed elevator building, situated on railroad ground of the C., M. & St. P. Ry., in the town of Newhall, Benton county, Iowa."

On the 12th of September, 1883, a fire occurred, destroying the elevator and its contents. Notice of the fire was given to the company in the form of an affidavit signed by Eyler, in which he states that his el-

---

[1] As to when equity will grant reformation of written instruments or other relief on the ground of mistake, see Critchfield v. Kline, (Kan.) 18 Pac. Rep. 898, and note; Appeal of Hollenback, (Pa.) 15 Atl. Rep. 616, and note; Schwass v. Hershey, (Ill.) 18 N. E. Rep. 272, and note; Gerdine v. Menage, (Minn.) 43 N. W. Rep. 91, and note; Herrick v. Starkweather, 8 N. Y. Supp. 145.

evator, insured by the company, had been destroyed by fire, and his loss amounted to the sum of $4,800.   On the 6th day of October, 1883, proofs of loss were furnished, in the form of an affidavit, signed by Eyler and Abraham, in which it was set forth that Abraham was the real owner of the property and business, and that the latter was carried on in name of Eyler, but in fact was the business of Abraham.   The defendant company refusing to pay, an action at law was brought by Abraham, setting forth the policy, the happening of the fire, the actual condition and ownership of the property; that the same were known to the defendant at the time the policy was issued; and that the policy was in fact intended to cover his interest.   The company demurred to the petition, and the court held that upon the face of the policy it was a contract insuring the interest of Eyler, and not that of Abraham, and that in the action at law relief could not be had on the grounds alleged, but that the same must be sought by a proceeding in equity.   Thereupon the present bill was filed, and, issue being joined therein, the cause is submitted upon the pleadings and evidence; the object sought by the bill being a reformation of the policy so as to conform it to what, it is claimed, was the real contract of insurance intended to be represented by it.

The evidence clearly establishes the fact that the elevator, and the business carried on in connection therewith, belonged in fact to Abraham, and that Eyler had no money interest therein.   If the same was destroyed by fire, the loss would be Abraham's, and not Eyler's, and therefore any insurance against loss by fire, to be of any value, must be available to Abraham. ·  The only testimony touching the interviews had relating to the issuance of the policies is that of Abraham and Eyler.   It is stipulated by the parties that the defendant has made due effort to ascertain the present whereabouts of Snyder, but has been unable to find him or procure his testimony.   Abraham testifies that he had known Snyder for several years before the policy in the Council Bluffs Company was issued; that he was engaged in the insurance business; that, on the day of the issuance of the policy in the Council Bluffs Company, Snyder came to complainant's office, at Watkins, to see about insuring the elevator; that in that conversation he told Snyder that he owned the elevator, its contents, and the business carried on therein; that Eyler was merely an employe, on a monthly salary; that the property and business was kept in the name of Eyler because complainant was running an elevator at Watkins, on the Chicago and Northwestern road, and the railways competing with each other would not permit both elevators to be run by one person; that Snyder agreed to insure the property; that the price was agreed upon, to-wit, $75; that the agreement was to insure his property; that he paid Snyder the agreed premium; and that the latter agreed to, and did, issue the policy in the Council Bluffs Company.   He further testifies that at this interview he told Snyder of the fact that there was a mortgage on the property to Rosenbaum Bros., and Snyder told him he had been at Newhall, and had gone through the building, and knew its condition.   There is nothing to contradict or

weaken this testimony, except the fact that it comes from complainant, and that his interest would lead him to stretch his recollection to the utmost in aid of his own case. Giving full weight to this consideration, it must still be held that the main facts testified to are proven, unless we are to wholly disregard complainant's testimony. If, then, it be true that Snyder came to Watkins to see Abraham about the insurance on the property at Watkins, and that the contract was there made and closed by the payment of the premium and the issuance of the policy, is it not clear that Snyder did make the contract of insurance on behalf of the Council Bluffs Company with Abraham, receive payment from him of the premium, and deliver the policy to him, and can these facts be explained on any other theory than that Snyder knew that Abraham was the real party in interest, the one whose interest in the property was such as to authorize him to contract for its insurance, and whose interest was to be protected? The policy he delivered for the Council Bluffs Company, upon its face, provides that in case of loss the amount due was to be paid to Abraham, mortgagee, thus showing that he knew that Abraham was interested in the property. The undisputed facts that Snyder came to Abraham for the purpose of getting the insurance upon the elevator; that he made the contract with him, received payment of the premium from him, and delivered the policy to him,—show that Snyder knew that Abraham had an interest in the property, and then, too, corroborate Abraham's testimony, to the effect that Snyder knew the facts as they existed, and agreed to insure the property, knowing Abraham to be in fact the sole owner thereof. It is clear, beyond question, that Abraham's purpose in entering into the contract of insurance must have been to procure insurance for his own benefit; and the entire evidence, therefore, fully justifies the conclusion that Abraham, on the one part, and Snyder, on the other, intended to, and did in fact, contract for insuring the property in question for Abraham's benefit, and for his protection, as the actual owner thereof. When Snyder filled out the policy, he so worded it that it failed to embody the contract he had made with Abraham. He seems to have thought that, as the property and business were ostensibly carried on in the name of Eyler, the policy must be made in his name, with the provision that in case of loss payment was to be made to Abraham, mortgagee. In thus writing the policy, Snyder failed to express the contract he had in fact made, and failed to give any insurance upon the property which could be enforced. Under such circumstances, unless the policy can be reformed, the contract which was in fact made cannot be enforced. But it may be very truthfully said that in all the acts thus done by Snyder he was acting as the agent of the Council Bluffs Company, having no relation with the defendant; and that proving that a case for the reformation of the one policy exists does not show that a like case exists as against the present defendant. In one sense, this is true; yet the true force and significance of the acts of the parties touching the policy issued by the defendant company cannot be understood without reference to the acts of the same parties connected with the first policy issued. Touching the policy issued

by the defendant, it appears that Abraham concluded that he should have a larger amount of insurance upon the property than was afforded by the policy in the Council Bluffs Company, and he told Eyler that, in case he (Eyler) should see Snyder before he himself did, he should tell him that he wanted additional insurance. Abraham testifies that in January, 1883, Snyder came to him at Watkins for the purpose of discussing the question of additional insurance; that he was busy at the time, and told him to see Eyler about it. Eyler testifies that Snyder came to Newhall, and told him that Abraham had sent him there to see about taking out additional insurance, to the amount of $1,000, on the elevator property; that Snyder inquired whether there had been any changes in the property since he had insured it before, in the Council Bluffs Company; that witness told him there had been no change; that there was the mortgage to Rosenbaum Bros. still on it; that Snyder said the Council Bluffs Company would not take a further risk on the property, but that he was agent for the North German Company, and that Abraham could get additional insurance in that company; that he went over the building, examining it; that he said the premium for $1,000 insurance would be $30; that the witness paid him $30, out of money belonging to Abraham, and Snyder agreed to send the policy from Cedar Rapids; that the policy came to him by mail a day or two afterwards. As has been already said, there is no testimony contradicting that of Eyler and Abraham. Can there be, then, any reasonable doubt that when Snyder arranged for the issuance of the additional insurance for $1,000 he knew the facts touching the elevator property just as fully as when he issued the first policy, or, in other words, that he knew that Abraham was the owner of the property sought to be insured; that it was his interest that was to be protected; that the money paid him was so paid for the purpose of securing protection for Abraham, and for no other purpose? This being so, can there be any doubt that Snyder intended to, and did, contract to insure the property for the benefit of Abraham, as the owner thereof, just as Eyler testifies he agreed to do? If he in fact agreed to insure the property for the benefit and protection of Abraham, and received the consideration for such contract of insurance, but, in writing out the policy, he failed to make it express the real contract he had entered into, is it not clearly a case for reformation of the policy, provided the defendant company is bound to make good the contract which Snyder in fact made in their behalf?

This brings us to a consideration of the relation in which Snyder stood to the defendant company. Upon this question the defendant has introduced no evidence whatever, but insists that the burden is upon complainant of establishing the fact of his agency and the extent of his powers. This is undoubtedly true, yet, as it is within the power of the defendant company to readily show the limitation on his powers and authority, if any exists, the court is justified in assuming from the silence of defendant that his authority was as extensive and complete as the uncontradicted evidence fairly shows it to have been. It appears beyond question that Snyder assumed to act for the defendant company. He

agreed to take insurance for the sum of $1,000 on the property of the defendant company. He fixed the rate of premium to be paid. He received payment of the premium, and agreed to have the policy written out and forwarded. He did not take a written application for insurance, setting forth the condition of the property, and agree to submit that to the company, but he examined the building himself, made inquiries regarding the title and other matters connected with the property, and closed the contract of insurance on the spot, received payment of the premium, and agreed to have the policy written out and forwarded, which was done in due season. No communication, written or verbal, ever passed between the company and Abraham or Eyler touching the issuance of the policy, except that had between Snyder and these parties. The company issued the policy by reason of the contract entered into by Snyder. The policy, as issued by the company, acknowledges the receipt of the premium. The issuance of the policy by the company is a ratification of the action of Snyder in their behalf, and justifies the conclusion that he was their agent in that transaction. Thus, in *Bronson's Ex'r* v. *Chappell,* 12 Wall. 681, it is said:

"Agents are special, general, or universal. Where written evidence of their appointment is not required, it may be implied from circumstances. These circumstances are the acts of the agent, and their recognition or acquiescence by the principal. The same considerations fix the category of the agency and the limits of the authority conferred. Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exist, in all respects, as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it did not reach so far, and that the third party had acted under a mistaken conclusion. He is estopped to take refuge in such a defense."

The inference to be fairly drawn from the act of the company in issuing the policy is that in contracting for the insurance of the property Snyder was their agent. In dealing with Abraham, Snyder assumed to act on behalf of the company, as their agent, and the company, by issuing the policy, recognized and affirmed such action on his part; and the court, therefore, is entirely justified in finding that Snyder represented the company in contracting for the insurance upon the property, and that the company is bound by his acts in that particular.

It is argued for defendant that it can only be properly bound for the contract appearing upon the face of the policy; that it consented to make that contract, and no other; and that it cannot be inferred that Snyder had authority to make any other contract than that evidenced by the policy as issued. If this contention is correct, it practically eliminates Snyder from the case, and holds that he was not the agent for the company in any sense, and that the defendant is not bound by anything that took place before the issuance of the policy. The evidence, beyond question, shows that the actual contract of insurance was made at Newhall. It was at Newhall that the amount of the insurance was agreed

upon, the price to be paid was settled, and the payment thereof made and received. If Snyder represented the company, the contract was made at Newhall, and at no other time or place. What was afterwards done by the company was solely in recognition of this contract. The company, by its action, justifies the conclusion that it recognized the authority of Snyder to contract for the company touching the insurance of the property in question. It was upon the faith of the contract made with Snyder that Abraham, through Eyler, paid the premium agreed upon. The company has received the premium thus paid, and cannot now be permitted to say that it is not bound by the contract made by Snyder. The company, through its agent, Snyder, contracted to insure the property in question for the benefit of Abraham, the real owner thereof, and was paid by him for so doing. The company, through its agent, filled out the policy, but so worded it that in legal effect it insured Eyler's interest, in whose name the business was carried on. This is not what the parties intended or contracted for.

It is said that the policy was written as the parties agreed should be done; and that the mistake as to its legal effect is a mistake of law; and that a court of equity will not grant relief in such cases. In entering into contracts, parties are deemed to know the principles established by law, and contracts are construed with reference to the law applicable to the subject-matter of the contract; and therefore, in that sense, the law, as it actually is, enters into and forms part of the contract that the parties make. If, however, in a given case, the parties actually mistake or misunderstand the principle of law applicable to the subject-matter of the contract, and reach an agreement relying upon this mistake of the law, there is no ground upon which a court of equity can reform the contract. The court cannot know whether the parties, if they had correctly understood the law, would have entered into any contract on the subject, or what terms they might have reached touching the same. While the court might, therefore, be entirely satisfied that the parties, had they in fact correctly understood the principles of law applicable to the case, would not have made the contract they did make, the court cannot know what contract they would have made, if any; and therefore, in such case, the court cannot reform the contract, although it might be justified in setting it aside. When, however, the mistake lies, not in a misunderstanding of the principles of the law as controlling the subject of the contract, or the rights of the parties connected therewith, but merely in the terms proper to be used in defining the actual contract of the parties, such a mistake, though in one sense a mistake of law, is one that a court of equity will correct. The mistake sought to be reformed in the present case falls within the latter category. The evidence clearly establishes the fact that the actual agreement of the parties was that the property was to be insured for the benefit of Abraham, who was the real owner, and that the company entered into this contract with full knowledge of the condition of the property, of the ownership thereof, and the incumbrance thereon. It is not a case, therefore, of a mistake in the contract actually made, but of a mistake in the terms used in filling out the policy, whereby

it does not represent the contract actually existing between the parties. The power of the court to correct a mistake of this nature, and to conform the policy to the contract as actually made, cannot be questioned. *Williams* v. *Insurance Co.*, 24 Fed. Rep. 625; *Snell* v. *Insurance Co.*, 98 U. S. 85. Complainant is therefore entitled to a decree for the reformation of the policy of insurance issued by the defendant company, as prayed for in the bill of complaint, and for costs.