McELROY v. BRITISH AMERICA ASSUR. CO. OF TORONTO, CANADA.

(Circuit Court of Appeals, Ninth Circuit. May 8, 1899.)

No. 479.

1. INSURANCE—WAIVER OF CONDITIONS OF POLICY—KNOWLEDGE OF AGENT.
    Where the agent of an insurance company, at the time he writes a policy, has knowledge of an incumbrance on the property, or that the insured has procured or arranged to procure concurrent insurance thereon, his knowledge binds the company, in the absence of fraud, and it is estopped to claim the invalidity of the policy on such grounds, notwithstanding any provisions of the policy in that regard.[1]

2. SAME—PAROL EVIDENCE TO VARY CONTRACT.
    Provisions in an insurance policy that it shall be void in case of concurrent insurance or a mortgage on the property, unless the consent of the company thereto is shown by a written indorsement on the policy, do not prevent the insured from sustaining the validity of the policy by parol evidence showing that it was issued with knowledge of the existence of concurrent insurance or of a mortgage on the property.

3. SAME—AGENCY OF SOLICITOR.
    An insurance solicitor, who takes an application for insurance, which is approved and accepted by an insurance company, and on which it issues a policy, and delivers it to the solicitor, who delivers it to the insured, and collects the premium, is, by the ratification of his acts done in its behalf, made the agent of the company in the transaction, and his knowledge binds the company, notwithstanding a provision of the policy that no person, unless duly authorized in writing, shall be deemed its agent; the insured having no knowledge of the actual relations between the solicitor and the company.

4. SAME—FAILURE OF INSURED TO READ POLICY.
    An insured has the right to rely on the presumption that the policy he receives is in accordance with his application, and his failure to read it will not relieve the insurer or its agent from the duty of so writing it.

---

[1] As to waiver of conditions against other insurance, see note to Insurance Co. v. Thomas, 27 C. C. A. 46.

In Error to the Circuit Court of the United States for the Northern Division of the District of Washington.

This action was brought by James F. McElroy, plaintiff in error, in the superior court of the state of Washington, to recover $2,169.30 and interest, alleged to be due upon a policy of fire insurance issued to Mrs. J. C. Powers, plaintiff's assignor, by the defendant in error. Upon the petition of defendant, the case was removed to the circuit court of the United States for the district of Washington, where it was tried before a jury. At the close of the testimony, the court, at the request of the defendant, instructed the jury to return a verdict for the defendant, and the jury found accordingly. Judgment was entered on the 5th day of August, 1898, to reverse which the plaintiff sued out this writ of error.

The policy in question—No. 825,596—was issued on January 23, 1896, insuring the steamer Cricket, her hull, cabins, tackle, furniture, etc., against loss or damage by fire, to the extent of $3,000. The defense set up in the court below was that the policy was rendered void by the action of the insured in procuring concurrent insurance on the same property in excess of the amount permitted in defendant's policy, and because a chattel mortgage upon the property insured was in existence at the time the policy was issued, of which defendant had no knowledge or notice. It appears that Mrs. J. C. Powers was the owner of the steamer Cricket from the 1st day of January, 1896, up to the time of its loss, on or about February 5, 1896; that during this period Capt. E. M. Barrington, son of Mrs. Powers, was captain and managing agent of the Cricket, and was operating the steamer for the transportation of freight and passengers upon the waters of Puget Sound, between the cities of Seattle and Everett. Some days prior to January 23, 1896, H. C. Ewing, a member of the firm of Calhoun & Co., insurance agents in Seattle for a number of companies, called on Capt. Barrington, requesting the privilege of writing insurance upon the Cricket. No contract was made at this time. Some days later, W. M. Calhoun, of the same firm, saw Capt. Barrington, and conversed with him regarding the insurance. In this conversation Barrington claims to have told Calhoun that he wanted to carry $10,000 insurance on the steamer, but that he could probably give Calhoun & Co. only $6,500 of it, because a mortgage on the steamer was held by Capt. MacFarland, who might wish to personally procure the writing of insurance to cover the mortgage. Barrington further testifies that on January 24th he had a conversation with Calhoun by telephone, in which he told Calhoun that the mortgagee had consented to his procuring the insurance, but that he had decided to place that amount ($3,500) through another agent, J. S. McCormick, and would therefore give Calhoun & Co. the writing of $6,500, as previously talked of; that Calhoun told him the steamer had been covered to that amount already, and he would bring the policies to Barrington very soon. Calhoun testifies, with reference to these conversations, that Capt. Barrington told him of the mortgage, but that the largest sum mentioned as insurance desired on the steamer was $6,500; that in the conversation by telephone the captain mentioned his intention of giving $3,500 of the insurance to McCormick, but before the close of the conversation decided to leave matters as they were, thus giving to Calhoun & Co. the entire amount of $6,500. He testifies that he did not know of the additional $3,500 being placed on the steamer, or that it was desired to secure any insurance over $6,500, until after the fire occurred. Immediately after this telephone conversation, which occurred about noon of January 24th, Barrington ordered $3,500 insurance from McCormick. This was written by two companies, the Connecticut, of Hartford, and the Providence, of Washington, and was in favor of the mortgagee, covering the risk from noon of January 24, 1896. These policies were delivered to Capt. Barrington on January 25th. The insurance given to Calhoun & Co. was not written by the companies they represented, but was placed by Calhoun with Hanford & Stewart, agents in Seattle of the Palatine Insurance Company, and C. A. McKenzie, agent for the British America Assurance Company, of Toronto, Canada (the defendant in error), in the amounts of $3,500 and $3,000, respectively. The policy of the latter company covered the risk from noon of the 23d day of January, 1896, and was delivered to Barrington by Ewing, of Calhoun & Co., on January 24, 1896, together with the policy of the Palatine Company, which was written on January 24th. The premium on the defendant's policy was $75,

$50 of which Barrington paid Ewing at this time. On the back of the defendant's policy was pasted a printed slip, reading: "Return for renewal, transfer, or indorsement to Calhoun & Co., Insurance, S. E. Cor. Yesler Ave. and Commercial St., Seattle, Wash." The policies of the Connecticut and Providence Companies in favor of the mortgagee do not limit the amount of concurrent insurance. In the policy written by the Palatine Company, for $3,500, these words appear: "$3,000 other concurrent insurance permitted;" and in that issued by defendant in error, for $3,000, the following: "$6,500.00 insurance in all permitted, concurrent herewith;" also: "This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if the insured now has or shall hereafter make or procure any other contract of insurance, whether valid or not, on property covered in whole or in part by this policy; * * * or if the interest of the insured be other than unconditional and sole ownership; * * * or if the subject of insurance be personal property, and be or become incumbered by a chattel mortgage." The steamer was destroyed by fire February 5th following, at Everett, Wash. Before the expiration of the 30-day credit, Mrs. Powers tendered payment of the balance of the premium, but the tender was refused. In due season, to wit, February 21, 1896, the insured furnished proofs of loss to Calhoun & Co., and was notified by them that such proofs had been turned over to the defendant company. This company denied any liability upon its policy, refusing to pay any loss incurred thereon; hence suit was brought for the recovery of the amount apportioned by appraisement to be due from defendant upon its said policy.

Harold Preston, E. M. Carr, and L. C. Gilman, for plaintiff in error.

George Donworth and James B. Howe (S. H. Piles, of counsel), for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

There is but one assignment of error, namely, that the court below erred in granting the motion of the defendant company to give a peremptory instruction to the jury to find a verdict for the defendant, and in giving such peremptory instruction; and the single question presented is whether or not the plaintiff in error had the right to have his case submitted to the jury. It is contended on the part of the defendant, as matter of law, that the policy is void, for the reason that it in express terms provides that, if a chattel mortgage exists on the property, or if insurance shall be obtained to any greater extent than $6,500 in all, concurrent with the amount covered by the policy, it shall be void, and both of such forbidden acts are established by the evidence on the part of the plaintiff to have been done. The plaintiff asserts, on the other hand, that defendant had notice and knowledge of the existence of the mortgage and of the intention of the insured to apply for insurance to the amount of $10,000 in all, through Calhoun & Co., its agents. To this the defendant replies that Calhoun & Co. were not its agents, but rather the agents of the insured, and therefore any notice or knowledge that Calhoun & Co. may have had was not the knowledge of the defendant. Several witnesses testify as to the notice given to Calhoun & Co. of the existence of the mortgage. Barrington was asked, with regard to his conversation with Ewing, of the firm of Calhoun & Co., if anything was said in relation to the chattel mortgage upon the steamer, and replied:

"I told him that I had to have $3,500 of it written up to Captain MacFarland, of Everett: that I could not promise him that insurance; that I did not know whether he wanted me to insure with Seattle firms or not; likely he might want the same men that insured the year before in Everett; and $6,500 for my mother. Q. What reason, if any, did you give him for the necessity of having insurance written in favor of or payable to Captain MacFarland? A. That he held the mortgage on the steamer for that amount."

And in an interview with Mr. Calhoun a few days later he stated the following language was used:

"He (Calhoun) asked me then how much I wanted to insure for, and I told him the whole amount was $10,000. $3,500 of it was to go to Captain MacFarland, of Everett, and $6,500 to Mrs. Powers. I told him I could not promise him the $3,500 until I seen Captain MacFarland,—whether he wanted to have it or not,—but the $6,500 he could have; and he said, 'All right.' He says, 'You try and get the $3,500 for me from Captain MacFarland, and I will write the whole $10,000.' I told him, 'All right;' I would see Captain MacFarland, and see what I could do for him. He asked me what I wanted to insure $3,500 with MacFarland for. I told him he had the mortgage on the boat for that amount. He said he would go ahead and write up the $10,000 just as soon as I could see Captain MacFarland, whether he would get the $3,500 or not. If he could get MacFarland, he would write up the $10,000."

Calhoun testifies:

"Q. Did Captain Barrington say anything to you, at the time the insurance was being negotiated, about having to protect the mortgage by insurance? A. Yes, sir. Q. What mortgage did he state? A. He said the mortgage for the purchase price,—the balance of the purchase price of the boat to Captain MacFarland and others. I do not know the names of the others. * * * Q. You know there was a mortgage? A. Yes, sir. Q. And yet you allowed these policies to be delivered without any permission for a mortgage on them? A. Yes, sir. Q. Had you given any notice to anybody about a mortgage? A. Yes, sir; to Mr. McKenzie. The reason that that indorsement was not on that policy was because Barrington did not know the names of the mortgagees, and I told him that we would explain the matter to the agents, and arrange with them so that the indorsement could be made afterwards. * * * Q. I understand you to say that the reason why you let the policy go out was because you had an agreement with Captain Barrington that later on that chattel-mortgage clause would be indorsed on the policy? A. I had both that with Captain Barrington and the agent. Q. You had that agreement with Captain Barrington and the agents? A. Yes, sir."

Ewing, of Calhoun & Co., testifies that during the negotiations Capt. Barrington spoke about an insurance of $3,500 for the protection of Capt. MacFarland, and that he at one time told him he contemplated placing more than $6,500 insurance on the steamer.

With regard to concurrent insurance, McCormick, the agent placing the insurance in favor of the mortgagee, testified that he was present in the drug store of Yorke A. Barrington on the 24th day of January, 1896, when Capt. Barrington had a conversation over the telephone with some person regarding insurance on the steamer Cricket, and heard him say to this party, "I have concluded to have Mr. McCormick write $3,500 of this insurance," and request the person at the other end of the telephone to deliver the policies for the other insurance; that at the close of this conversation Capt. Barrington placed an order with the witness for $3,500 insurance, and said he had given orders to Mr. Calhoun for $6,500,—making a total insurance of $10,000.

94 F.—63

Yorke A. Barrington, a brother of Capt. Barrington, testified, with relation to the same conversation by telephone:

"He asked for Calhoun, and he talked with a gentleman, and he told them that he could go ahead with the $6,500 insurance, and that he had decided to give McCormick $3,500, and my brother turned, and asked what company he represented, and McCormick said the Hartford, and he communicated that to the gentleman at the other end of the 'phone; and then, when he got through with the conversation, he turned to McCormick, and told him that he should write up the $3,500."

From this testimony it appears that there was evidence sufficient to go to the jury tending to establish the fact that at the time the policy of insurance was issued and delivered to Barrington, the agent of the insured, Calhoun & Co., the insurance agents, had notice and knowledge of the existence of the mortgage and of the additional concurrent insurance. There was also evidence tending to establish the fact that McKenzie, the agent of the defendant, had notice of the mortgage, and that the name of the mortgagee was to be inserted in the policy afterwards.

Under the weight of authority, the defendant is estopped from asserting the invalidity of its policy for violation of the conditions of the policy, if such alleged violation was known by the defendant at the time of its issue. Mesterman v. Insurance Co., 5 Wash. 524, 32 Pac. 458. "If the agent knew of the other insurance when the contract was entered into, it is not only a waiver of notice, but also of a forfeiture on that ground." Wood, Ins. § 406. In Beebe v. Insurance Co., 93 Mich. 514, 53 N. W. 818, it was held that where the agent of the insurance company, with knowledge as to the amount of incumbrance upon property insured, misstated such amount in an application for insurance made out by him, and which plaintiff, without reading, signed, and the agent assured plaintiff that the application was all right, and that she was fully protected, the defendant company could not deny its liability under a provision of the policy that the application was a warranty as to the material facts, and that a misstatement would void it; the company being presumed to have the knowledge of its agent. The same doctrine is upheld in Wood v. Insurance Co., 149 N. Y. 382, 44 N. E. 80, where the court of appeals say:

"The restrictions inserted in the contract upon the power of the agent to waive any condition unless done in a particular manner, cannot be deemed to apply to those conditions which relate to the inception of the contract, when it appears that the agent has delivered it and received the premiums with full knowledge of the actual situation. To take the benefit of a contract with full knowledge of all the facts, and attempt afterwards to defeat it, when called upon to perform, by asserting conditions relating to those facts, would be to claim that no contract was made, and thus operate as a fraud upon the other party."

In Robbins v. Insurance Co., 149 N. Y. 477, 44 N. E. 159, the policy of insurance upon certain personal property contained a condition that the entire policy, unless otherwise provided by agreement indorsed thereon, or added thereto, should be void if the subject of insurance be personal property, and be or become incumbered by a chattel mortgage. It also contained the other provisions usually contained in the standard fire insurance policy, among which was a

provision making the policy subject to the stipulations and conditions contained in it, and also a provision to the effect that no officer, agent, or other representative of the company should have power to waive any condition or provision of the policy, except such as might, by the terms of the policy, be subject to the terms indorsed thereon or added thereto, and that as to those provisions and conditions no officer, agent, or representative should be deemed or held to have waived any of them, unless the waiver was written upon the policy. When the policy was issued there was a chattel mortgage upon the property insured, but there was no indorsement upon the policy with respect to it. The soliciting agent who procured the insurance was, however, informed as to the mortgage. When the testimony was closed, the defendant's counsel asked the court to direct the jury to return a verdict for the defendant, on the ground that at the time of the issuing of the policy the property insured thereby was incumbered by a chattel mortgage, and that there was no agreement indorsed upon the policy, or added thereto, in reference to such chattel mortgage. The motion was denied, and a verdict and judgment entered in favor of the plaintiff. On appeal to the court of appeals that court determined that it would be presumed, if anything had been omitted which it was necessary to do to make the policy valid, it was by mistake, or that the condition was waived, or that the defendant company held itself estopped from setting it up. It was accordingly held that the company was barred from claiming that the policy was invalid because of the existence of the chattel mortgage.

Notwithstanding an insurance policy contains a proviso against additional insurance except upon "the consent of this company written hereon," and provides also that "the use of general terms, or anything less than a distinct specific agreement, clearly expressed, and indorsed upon this policy, shall not be construed as a waiver of any printed or written conditions or restriction therein," yet where an agent with whom all the dealings were had, and whose authority is not shown to have been restricted in any way, has so acted as to have bound himself by way of estoppel not to dispute the validity of certain additional insurance on the point of consent, the company will be likewise bound. Insurance Co. v. Earle, 33 Mich. 144. Insurance Co. v. Spiers, 8 S. W. 453, was a case where additional insurance had been procured without the assent of the original insurer being indorsed upon the back of the policy, as provided by the terms of the policy. The court of appeals of Kentucky, in passing upon the points involved, say:

"It has been held in some few cases that, where the policy provides for a forfeiture in case of additional insurance without the written consent of the insurer indorsed upon the policy, it can only be waived by a literal compliance with the condition. The decided current of authority, however, is that this waiver may arise from the act or conduct of the insurer; and silence for an unreasonable time upon his part, after notice or knowledge of the breach of the condition, will constitute such conduct. * * * The term 'void,' as used in the policy, is to be regarded as meaning that the insurer may, at his exclusive option, treat it so, and not that the contract becomes an absolute nullity as to either party. The insurer may therefore, by his conduct, waive his right of forfeiture, and estop himself from insisting upon it. Baer v. Insurance Co., 4

Bush, 242. * * * It may now be regarded as settled law that insurance companies may, by conduct or parol agreement, waive it [condition of forfeiture], and become estopped from enforcing what is but a conventional condition of forfeiture. Insurance Co. v. Shea, 6 Bush, 174; Von Bories v. Insurance Co., 8 Bush, 133; Insurance Co. v. McCrea, 8 Lea, 513."

In the case of Insurance Co. v. Warttemberg, 48 U. S. App. 344, 24 C. C. A. 547, and 79 Fed. 245, in this court, a portion of the property insured was incumbered by a mortgage for $1,000 at the time of the insurance. The insured testified that he stated the facts concerning the incumbrance to the insurance agent, but an answer different from that which he gave was written in the application for the insurance by the agent, and assented to by the insured. This answer did not disclose the mortgage. The application contained the following condition:

"It is expressly understood and agreed that the valuation of all the property herein described is made by the applicant, and, if this blank be filled out by the agent, it is done at dictation of applicant, and every statement herein contained is to be deemed his own. This company will be bound by no statement made to or by the agent, unless embodied in writing herein."

The policy also contained the following:

"This insurance is based upon the representation contained in the assured's application of even number herewith on file in the company's office in San Francisco, each and every statement of which is hereby specifically made a warranty, and a part hereof; and it is agreed that, if any false statements are made in said application, this policy shall be void. * * * No agent or employé of this company, or any other person or persons, have power or authority to waive or alter any of the terms or conditions of this policy, except only the general agents at San Francisco; and any waiver or alteration by them must be in writing."

The property insured was farm property. It appeared from the testimony of the agent that he had authority to write commercial risks for the company, but no authority to write insurance on farm risks. On the submission of the case to the jury the defendant requested the court to instruct the jury to return a verdict for the defendant. The request was denied, and the jury returned a verdict for the plaintiff. The case was brought here on a writ of error, and it was contended by the plaintiff in error that the court erred in not instructing the jury upon the evidence to find a verdict for the defendant. It was held that, as there was nothing to show that the insurance company would have declined the risk if it had been aware of the fact that a portion of the property insured was under a temporary incumbrance, and nothing to show that either the insured or the agent perpetrated any fraud upon the insurance company, the latter could not avoid the policy by the defense that the insured, in his written application, had falsely warranted that the property insured was not incumbered. The doctrine of this case necessarily includes the rule that the information obtained by the agent concerning the risk will be imputed to the company accepting the services and representations of the agent in securing the insurance contract; but, aside from this principle, applicable to both cases, the two cases are to be distinguished in matters favorable to the validity of the policy under consideration. In the case at bar there is not a particle of evidence tending to show that the insured, either by state-

ment or assent, was guilty of any fraud or deception in representing the condition of the property or the concurrent insurance. On the contrary, there is evidence tending to show that the agent of the company at Seattle was notified by the agent who effected the insurance that the property was incumbered by a mortgage; and there was also evidence tending to show that the agent who effected the insurance had knowledge of the concurrent insurance on the mortgagee's interest.

Defendant also raises the question whether a policy of insurance may be varied by parol, despite any provision to the contrary contained in the instrument. A leading case upon this point is Insurance Co. v. Norwood, 16 C. C. A. 136, 69 Fed. 71. Caldwell, circuit judge, therein declares the early doctrine on this subject, as maintained in the case of Carpenter v. Insurance Co., 16 Pet. 495, has been so generally denied and repudiated by the courts of the country that it has come to be regarded as obsolete. He says:

"It is contended that consent to other insurance cannot be proved by oral evidence—First, because the policy provides that it shall be in writing, indorsed on the policy; and, second, because it would violate the rule against the reception of oral evidence to contradict or vary a written instrument. But it has been authoritatively decided that a contract of insurance is not within the statute of frauds, and may be by parol (Commercial Mutual Marine Ins. Co. v. Union Mut. Ins. Co., 19 How. 318; Insurance Co. v. Shaw, 94 U. S. 574; Henning v. Insurance Co., 2 Dill. 26, Fed. Cas. No. 6,366); and if it can be made by parol it may be varied by parol. Parties to contracts cannot disable themselves from making any contracts allowed by law in any mode the law allows contracts to be made. A written contract may be changed by parol, and a parol one changed by a writing, despite any provisions in the contract to the contrary."

In Insurance Co. v. Wilkinson, 13 Wall. 222, Mr. Justice Miller refers to the great value of the rule of evidence that a written contract cannot be varied by parol testimony, but further says:

"But experience has shown that in reference to these very matters the rule is not perfect. The written instrument does not always represent the intention of both parties, and sometimes it fails to do so as to either; and where this has been the result of accident, or mistake, or fraud the principle has been long recognized that under proper circumstances, and in an appropriate proceeding, the instrument may be set aside or reformed, as best suits the purposes of justice. A rule of evidence adopted by the courts as a protection against fraud and false swearing would, as was said in regard to the analogous rule known as the 'Statute of Frauds,' become the instrument of the very fraud it was intended to prevent, if there did not exist some authority to correct the universality of its application. It is upon this principle that courts of equity proceed in giving the relief just indicated; and though the courts, in a common-law action, may be more circumscribed in the freedom with which they inquire into the origin of written agreements, such an inquiry is not always forbidden by the mere fact that the party's name has been signed to the writing offered in evidence against him."

To the same effect is Association v. Wickham, 141 U. S. 564, 12 Sup. Ct. 84, where the court say:

"We have no disposition to overrule or qualify in any way the general and familiar doctrine enforced by this court in repeated decisions from the case of Hunt v. Rousmanier's Adm'rs, 8 Wheat. 174, decided in 1823, to that of Seitz v. Refrigerating Co. (decided at the present term) 141 U. S. 510, 12 Sup. Ct. 46, that parol testimony is not admissible to vary, contradict, add to, or qualify the terms of a written instrument. The rule, however, is subject to numerous

qualifications, as well established as the general principle itself, among which are that such testimony is admissible to show the circumstances under which the instrument was executed." Insurance Co. v. Gray, 43 Kan. 497, 23 Pac. 637; Haas v. Insurance Co. (Sup.) 1 N. Y. Supp. 895; Insurance Co. v. Earle, supra; Insurance Co. v. Wilkinson, supra.

Parol evidence is admissible to show that the statements given by the insured to the agent of an insurance company were different from those he transcribed in the application he sent to the company. Insurance Co. v. Pearce, 39 Kan. 396, 18 Pac. 291.

The case of Pechner v. Insurance Co., 65 N. Y. 195, was somewhat similar to the case at bar. The main question was whether the policy was void because there was other insurance upon the property without the written consent of the defendant. The jury found a verdict for the plaintiff, under an instruction from the court upon parol evidence. Defendant assigned the ruling as error, claiming that parol evidence could have no influence upon the contract. The court of appeals affirmed the ruling of the lower court in these words:

"This claim is, however, a misapplication of that rule, which is a cardinal one in construction, and simply designed to ascertain the true meaning and intent of a contract, which all parties concede to be valid. It has no application where the validity or existence of the contract itself is in question. It is familiar law that a written instrument may be shown to be void by parol evidence. It may be thus attacked and overthrown for fraud, illegality, want of consideration, or other vice going to the existence of the instrument. If it can be so attacked, it can be sustained in the same manner."

Defendant, however, contends that any knowledge Calhoun & Co. may have had cannot be imputed to the defendant, for the reason that Calhoun & Co. were not its agents in effecting the insurance in this case. The policy in question provides: "In any matter relating to this insurance, no person, unless duly authorized in writing, shall be deemed an agent of this company." This provision was not carried out literally with regard to Calhoun & Co., but it is a well-settled rule in the law of agency that the acceptance and approval by the company of the acts of another in behalf of the company constitute a recognized agency. No communication, either written or verbal, passed between the defendant and the insured, touching the issuance of the policy, but the company issued the policy upon the representations of Calhoun & Co., and in pursuance of business methods customary between them; thus ratifying the action of Calhoun & Co. in its behalf, and justifying the conclusion that they were the agents of the defendant in error.

"Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exist, in all respects, as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it did not reach so far, and that the third party had acted under a mistaken conclusion. He is estopped to take refuge in such a defense." Bronson's Ex'r v. Chappell, 12 Wall. 681; Lamberton v. Insurance Co., 39 Minn. 129, 39 N. W. 76; Abraham v. Insurance Co., 40 Fed. 717.

"An agent who solicits the insurance, takes the application, receives the premium, and delivers the policy, may, in our opinion, by his conduct or acts, bind

his company by way of waiver of a forfeiture on account of additional insurance, in the absence of knowledge upon the part of the assured that his powers in this respect have been restricted. This being so, it follows that the knowledge of the agent, under such circumstances, is to be imputed to the company." Insurance Co. v. Spiers, supra.

In Insurance Co. v. Pearce, supra, the question involved the power of an insurance solicitor to bind the company. Beals was canvassing for business for the insurance company, and induced Pearce to insure with it. When the application was taken, the solicitor wrote down all of the answers, and read over a part of them to Pearce, who signed them, without knowing all the answers that were ,in the application. Some of the statements written were false, and, upon a loss occurring, the insurance company denied its liability, claiming the policy to be void, in conformity with the following provision of the policy:

"This indemnity contract is based upon the representations contained in the application, of even number herewith, and which the assured has signed, and permitted to be submitted to this company, and which is made a warranty, and a part hereof; and it is stipulated and agreed that, if any false statements are made in said application, * * * this policy shall be null and void."

The company also disclaimed liability for the acts of Beals, stating that he was merely a solicitor, with power only to take and forward applications. In the lower court the jury rendered a verdict for the insured, and the supreme court affirmed the judgment of that court, saying:

"The company did make him [Beals] its solicitor, and it must be presumed that he was given full power to take applications and give such information to the company as he might obtain either from the applicant or from other sources. For this purpose, at least, he was the agent of the company, with full power; and if he wrote down false statements after he had been truthfully informed by the applicant, and after a personal inspection of the premises, the assured should not suffer for his misrepresentations. * * * We are of the opinion that after the defendant had received the premium of the plaintiff, and issued him a policy, that it was estopped from denying the truth of the statement filled in by its own agent in the application of plaintiff. The knowledge that Beals possessed was, for the purposes of this action, the knowledge of the company. He was acting as its agent, and it was his especial duty to ascertain the actual facts about the risk, as the company made him its agent for that purpose. * * * The current of the later authorities seems to be that the agent who takes the application and obtains the policy must be regarded for those purposes as having full power to act for and bind the company; and, after having received money from the insured, it cannot be heard to say that the statements in the application were false, when there was no fraud or attempt to deceive and misrepresent on the part of the assured."

It is a well-known custom now for insurance companies to accept applications for insurance through the medium and agency of insurance agents or solicitors, who procure the applications, and place the insurance with such companies as they may determine. These solicitors are furnished by the insurance company with printed arguments in favor of the special advantages offered, and stimulating the solicitors or agents to activity by the payment of large commissions on premiums obtained. The party who is thus induced to take out a policy knows little or nothing about the company or its officers, but relies upon the agent who has persuaded him to effect the insurance as the representative of the company

for all purposes of the contract, and certainly has the right to so regard him. The companies have endeavored to establish the doctrine that they can limit the responsibility for the acts of these agents to the receipt of the premium and delivery of the policy, and as to all other acts of the agent he is the agent of the assured. Some of the earlier decisions have supported this doctrine, but the tendency of modern decisions is steadily against it. The testimony shows that both Calhoun & Co. and McKenzie were engaged in business in the city of Seattle as insurance agents; that it was customary among the various insurance agents of Seattle to place business with each other at times; that in accordance with that custom Calhoun & Co. dictated and made the terms of the contract in controversy; that upon receipt of the order for insurance from Barrington, Calhoun & Co. placed $3,000 thereof with McKenzie, who at once issued the policy of the defendant for that amount in favor of plaintiff's assignor, and returned the policy to Calhoun & Co.; that Calhoun & Co. then pasted on the back of the policy a printed slip containing their business card, and delivered the policy, together with that of the Palatine Company, to Barrington, collecting a portion of the premium at that time. Such acts tended to establish the fact that Calhoun & Co. were the agents of the defendant in this transaction, and the evidence should have been submitted to the jury under proper instructions. Fidelity & Casualty Co. v. Egbert, 55 U. S. App. 200, 28 C. C. A. 281, and 84 Fed. 644; Insurance Co. v. Wilkinson, supra; Pitney v. Insurance Co., 65 N. Y. 6; Giddings v. Insurance Co., 90 Mo. 272, 2 S. W. 139. It may be said that the insured should have ascertained the correctness of the policy upon receiving it. Barrington, who acted for the insured in the matter, testified that he did open the policy, and note the company insuring, and the amount of insurance, but nothing more. It would certainly have been an act of prudence on his part to read the entire policy, but his neglect to do so cannot excuse the company for the default of the agent in not writing the contract in accordance with the representations made by the insured. The insured had a 'right to rely upon the agent's performing his duty of making the contract in conformity with the information given; and the agent's failure to do so, whether the result of a mistake or of a deliberate fraud, cannot operate to the prejudice of the insured. The contract of insurance is pre-eminently one that should be characterized by the utmost good faith on both sides. Insurance Co. v. Norwood, supra. In Kister v. Insurance Co., 128 Pa. St. 553, 18 Atl. 447, a policy was issued upon an application in which the agent had written down answers other than those given him by the applicant, and the insured signed the application in ignorance of this fact. The supreme court said:

"A copy of the application accompanied the policy, and it is argued that Kister [insured] could and ought to have read it, and, if he had done so, he would have seen the answers were untrue. These are considerations which were properly addressed to the jury. We cannot say that the law, in anticipation of a fraud upon the part of a company, imposed any absolute duty upon Kister to read his policy when he received it, although it would certainly have been an act of prudence on his part to do so. [Citing cases.] One thing is certain, how-

ever: the company cannot repudiate the fraud of its agent, and thus escape the obligations of a contract consummated thereby, merely because Kister accepted in good faith the act of the agent without examination."

"Plaintiff had a right to rely upon the assumption that his policy would be in accordance with the terms of his oral application. If the defendant desired to make it anything different, it should, in order to make it binding upon plaintiff, under the authorities in this state, have called his attention to those clauses which differed from the oral application." Gristock v. Insurance Co., 87 Mich. 428, 49 N. W. 634; Bennett v. Insurance Co., 106 N. Y. 243, 12 N. E. 609.

Upon the law as stated, and a review of the evidence, it is clear that questions of fact were presented which should have been submitted to the jury. The judgment of the circuit court is therefore reversed, and the cause remanded, with instructions to grant a new trial.