PEARSON v. MUTUAL LIFE INS. CO. OF NEW YORK.—68 S. W. (2d) 963.

Middle Section.   October 21, 1933.

Petition for Certiorari denied by Supreme Court, March 10, 1934.

504

Wilkes Coffey and J. J. Jewell, Jr., both of Murfreesboro, for appellant.

Walter Stokes, of Nashville, and J. D. Richardson, of Murfreesboro, for appellee.

CROWNOVER, J.   This was a suit to have reinstated a life insurance policy which had been canceled by the mother of insured. The complainant alleged that he was misled by defendant and caused to accept, in satisfaction of a policy of insurance issued to him, an amount which was a fraction of the amount to which he was entitled under the policy.  As grounds of rescission, complainant alleges that he was of unsound mind when he accepted the cancellation of the policy, and was also ignorant of his rights under the policy, and through the willful misrepresentations of the agents of defendant insurance company as to his rights under the contract of insurance he was misled and caused to accept said small amount, which acts of the company he charges were a constructive fraud.

Elam Brents Pearson, of Christiana, Rutherford county, Tennessee, a young farmer of the age of twenty-one years, obtained a policy of life insurance for $1,500 in the Mutual Life Insurance Company of New York, on November 14, 1924. He later obtained from the same company a policy of $2,000, dated September 20, 1926. Both policies provided for monthly disability payments, and that premiums should be waived during disability.

In October, 1926, he became ill and totally incapacitated for work. Some time in October his mother went to the Nashville office and paid the premium on the $2,000 policy for one year. At the same time she informed them that he was ill and unable to work. Some time in November she went to the Nashville office and paid the premium for a year on the $1,500 policy; again informing them of his total disability.  Some time prior to this proof of his disability had been duly given the company. The company began paying him disability benefits under both policies on November 18, 1926, and continued to pay same up to May 7, 1927, when it, for some reason not shown, ceased to make payments.  It appears that the company accepted premium on the $1,500 policy in 1926 after proof of disability and after it had begun paying benefits.

Some time in October, 1927, Mrs. Pearson paid the premium on the $2,000 policy for a year. In November, 1927, premium again fell due on the $1,500 policy.  Pearson was still ill in bed.  After several

notices had been received, his mother, Mrs. Pearson, fearing the policy would lapse for nonpayment of premium, decided to ask the company to cancel the $1,500 policy and pay him the cash surrender value of same. She wrote a letter to the company and had it copied on typewriter, which letter read as follows:

"December 30, 1927.

"Re: Policy No. 3383—853.

"I desire to surrender the above numbered policy for cash. Please send check to cover."

She then took the letter to her son for his signature. He was sick in bed, and he and she both say he did not know what he was doing, but he signed it, and she mailed it to the company. Pearson had previously obtained a loan of $27 on the $1,500 policy. On January 7, 1928, the insurance company mailed its check to Elam B. Pearson for $8.26, the check stating on its face: "In full settlement of Policy No. 3,383,853 and profits thereon now surrendered to the said company." Pearson cashed the check on January 14, 1928. He says he does not know anything about cashing the check, but his mother testified that when he was able to get out of bed she gave him the check and he went to the bank and cashed it.

In October, 1930, Pearson was able to look after his affairs. He consulted a lawyer about his rights under the two policies, who informed him that no premiums should have been required on either policy after November, 1926; that the $1,500 policy should not have been canceled; that he was entitled to disability payments under both policies; that, if suit had to be instituted, he should bring an action in the circuit court for payments under the $2,000 policy from May, 1927, to date, and under the $1,500 policy from May, 1927, to the date of cancellation, and should file a bill in the chancery court to have the $1,500 policy reinstated. His attorney, Wilkes Coffey, Jr., wrote the following letter to the company, on October 14, 1930:

"I am herewith enclosing affidavits and statement of Dr. Brush as proof of disability of Mr. Pearson. You will notice from the proof that Mr. Pearson has been unable to do any work beginning with the year 1927 and on up to the present time. During this period one of his policies was cancelled and he now thinks that this policy should be reinstated; that he should receive the benefits under both policies during the whole year of 1927 and on to the present time, subject to the credits from the small amounts which you have paid him.

"Trusting that you will take this matter up at once and make adjustment of same, I am. . . ."

On February 15, 1931, the company began making payments under the $2,000 policy.

In March, 1931, Pearson brought an action in the circuit court of

506

Rutherford county to recover disability payments under the $2,000 policy from May 7, 1927, to February 15, 1931, and under the $1,500 policy from May 7, 1927 to January 14, 1928, the date of its cancellation. The home office of the insurance company calculated that the payments on the $2,000 policy and the refund of premiums amounted to $744.84, and the payments under the $1,500 policy to January 14, 1928, amounted to $105, and offered to compromise for $600, which was accepted by Pearson, and the following consent decree was entered, on April 19, 1932:

"In this cause it appearing that all matters have been compromised and settled, it is ordered, adjudged and decreed that said suit be and is dismissed at the cost of defendant."

And Pearson executed the following release:

"Whereas Elam B. Pearson filed suit in the Circuit Court of Rutherford County, Tennessee, against the Mutual Life Insurance Company of New York predicated upon a claim for certain disability benefits under two policies of insurance on his life issued by the Mutual Life Insurance Company of New York and being Numbers 2,383,853 and 3,697,978, respectively; and,

"Whereas all matters in said suit have been compromised and settled and the suit dismissed at the costs of the defendant;

"Now therefore in view of the premises and the sum of $600.00 paid to said Elam B. Pearson by the Mutual Life Insurance Company of New York, the receipt of which is acknowledged, and the same is accepted by the defendant in full compromise settlement, accord and satisfaction of all matters involved in said suit.

"This April 19, 1932.

"[Signed] Elam B. Pearson."

On June 15, 1932, Pearson filed the original bill in this cause, asking that the $1,500 policy be reinstated, and that he have decree against the company for the amount due him under same, alleging that the cancellation of the policy was procured by the constructive fraud of the company, as hereinabove stated. He tendered into court the said sum of $8.26.

The insurance company answered and denied that it knew or should have known that complainant was disabled under the terms of the policy from May 7, 1927, to January, 1928; and that it had been guilty of any bad faith or constructive fraud. It denied that Pearson had insufficient mental capacity at the time of the cancellation to agree to same; and alleged that all claims under both policies were settled in full in the circuit court case.

It was agreed at the trial in the chancery court that complainant was totally and permanently disabled, which agreement is as follows:

"It is agreed by and between the attorneys representing the plain-

tiff, and attorney representing the defendant, that they have been paying him a disability as provided for in the $2000.00 policy since November, 1926, from which time he has been totally and permanently disabled to follow any gainful occupation up until the present time.''

The case was by agreement heard on oral evidence by the chancellor, the jury being waived, but there was no written agreement to try the case under chapter 119 of the Public Acts of 1917.

The chancellor found and decreed that Pearson was not of unsound mind when he accepted the cancellation of the policy; that the policy was canceled at the instance of complainant without any fraud or undue influence on the part of the defendant; that complainant, who had paid off a loan to defendant in the cancellation, had not offered to restore his state of indebtedness; that he had sued the defendant and recovered on account of disability to the date of cancellation of policy; that complainant was guilty of laches which amounted to a ratification and waiver of all wrong, if any. He decreed that the allegations of the bill were fully met and denied in the answer and not sustained by the evidence, and he dismissed complainant's bill.

Motion for a new trial having been overruled, complainant appealed to this court, and has assigned errors, which are, in substance, as follows:

(1) There is no evidence to support the judgment of the court.

(2) The preponderance of the evidence is against the findings and judgment of the court.

(3) The court erred in finding that the policy was duly canceled at the instance of the complainant, without any fraud or undue influence on the part of defendant.

(4) The court erred in finding that by the cancellation of said policy the complainant paid off a loan to defendant, which he has not offered to restore to defendant.

(5) The court erred in holding that the judgment of the circuit court was res adjudicata.

(6) The court erred in holding that laches barred a recovery.

■■ The first five assignments will be treated together. The only testimony in the record on the subject of the mental state of Pearson at the time of the cancellation of the policy is that of himself and his mother—that he was ill in bed, running a temperature, and did not know what he was doing when he signed the letter, and still had not sufficient mental capacity to know what he was doing when he cashed the check. This testimony is undisputed by defendant, who took no proof. The chancellor found and decreed that ''the allegations of complainant to the effect that he did not knowingly request cancellation of the policy of insurance in question is not so sustained by the evidence

that the court is convinced of its correctness." On appeal, where the case was tried on oral evidence without a written agreement and not according to the forms of chancery practice, the material evidence rule is applied as if the case had been tried by a jury. Code, sec. 10622; Broch v. Broch, 164 Tenn., 223, 47 S. W. (2d), 84. Under this rule we are bound by the chancellor's finding that Pearson was not of unsound mind when the policy was canceled.

But it is shown by the record that neither Pearson nor his mother knew what his rights under the policies were, and there is no evidence to the contrary. They were misled by the company's agents in November, 1926, when they were required to pay premiums. When the premiums fell due in 1927 they were threatened with the lapse of the policies unless the premiums were paid. The company had the information that Pearson was totally incapacitated and knew that he was entitled to draw a monthly payment of $15 a month for the rest of his life without further payment of premiums, yet it canceled the policy, paying Pearson about $36 in full. Even if Pearson had sufficient mental capacity in December, 1927, and January, 1928, to know that he was canceling a policy under which his rights for life had accrued, he was ignorant of the fact that premiums on the policy were waived. This settlement was entered into by a man ignorant of his rights and almost without consideration. The only part the insurance company played in bringing about this cancellation was in demanding premiums when it knew he was totally incapacitated and in failing to inform him that premiums were waived under such circumstances. This suppression of material facts was a virtual fraud upon him. Story's Equity Jurisprudence (14 Ed.), 488, sec. 512. The oppressive bargain made by the insurance company was a constructive fraud. 1 Story's Equity Jurisprudence, 434, sec. 452.

"Relief from a settlement and compromise of a claim for insurance will be granted, where insured acted without any real consideration, in ignorance of the rights and obligations of the parties, while insurer had full knowledge thereof, and of his ignorance, and induced him to act by false and fraudulent misrepresentations, although the mistake was in respect to his legal rights. Where it sufficiently appears that through fraud and mistake a person has made a written surrender of a valuable right, or has released a subsisting cause of action, he may repudiate the same, even if the demands so released are disputed or unliquidated, and notwithstanding the mistake was not merely one of fact, but one of law as to the legal effect of a written instrument which operates as a gross injustice to one party and gives to the other an unconscionable advantage." 6 Couch's Cyc. of Insurance Law, 5126, 5127, sec. 1448.

"One who has been induced to accept, in full satisfaction of a loss

under a policy of insurance, one-half of the amount due, through fraud and imposition upon him and wilful misrepresentation made by the agents of the insurer, he being, as they knew, ignorant of his legal rights under the contract, may maintain an equitable action to rescind such contract of satisfaction.'' 6 Couch's Cyc. of Insurance Law, 5128, sec. 1448.

"These charges being admitted, it seems to us that the case presented involves something more than an effort to obtain relief purely on the ground of a mistake of law, or mere ignorance on part of appellant as to his legal rights under the contract of insurance. It becomes, in addition to this, a case of actual fraud, where by fraudulent misrepresentations made for the purpose and with the intent to deceive, the known ignorance of one of the parties to the contract has been willfully taken advantage of, and he has thereby been induced to surrender a valid, subsisting right without consideration. It is true that the ignorance relied upon is an ignorance of law rather than of fact, and that this is not always, or perhaps generally, and when standing alone, available as a ground of relief against an executed contract, no matter how inequitable it may be. On this point the decisions of the courts of this country, as well as the English courts, are by no means uniform, but, in our opinion, the weight of authority and the decisions of this court would now forbid that a party, who, with full knowledge of the ignorance of the other contracting party, has not only encouraged that ignorance, and made it the more dense by his own false and fraudulent misrepresentations, but has willfully deceived and led that other into a mistaken conception of his legal rights, should shield himself behind the general doctrine that a mere mistake of law affords no ground for relief.

"This view seems to be upheld by many, if not all, of the modern text-writers, who are recognized as authority on the question.

"Mr. Kerr, in his well-known work, in treating this subject says: 'But if it appear that the mistake was induced or encouraged by the misrepresentations of the other party to the transaction, or was perceived by him and taken advantage of, the court will be more disposed to grant relief than in cases where it does not appear that he was aware of the mistake.' Kerr on Fraud and Mistake, 399, 400.

"And, in his work on Equity, Mr. Bispham lays down this doctrine in even stronger and less uncertain terms. He says: 'Where ignorance of the law exists on one side, and that ignorance is known and taken advantage of by the other party, the former will be relieved. More particularly will this be so if the mistake was encouraged or induced by misrepresentations of the other party.' Bisp. Eq., sec. 188.'' Titus v. Rochester German Insurance Company, 97 Ky., 567, 31 S. W., 127, 128, 28 L. R. A., 478, 53 Am. St. Rep., 426.

510

"It is the widely prevailing view that if a material fact is not equally within the means of knowledge of two contracting parties, but peculiarly within the knowledge of one of them, who is or should be aware of the other's relative ignorance and his consequent bargaining disadvantage, any demonstrable advantage procured as the result of such inequality may be deemed as fraudulently procured. The fraud 'consists in dealing with the party in ignorance and leaving him so. It is not necessary that the other party should have created the false impression or intended it; it is sufficient that he knows it and takes advantage of it.' The same result follows where the other's misapprehension is one of law or legal right." 2 Lawrence on Equity Jurisprudence, 937, sec. 849.

"But if one of the parties by his failure to speak, when occasion demands it; or by his intentional concealment of a fact which is material and would operate upon the conclusion to which the other party would reasonably reach; or if one of the parties does anything that influences the other party to enter into the transaction, through a mistake as to the true facts, the conduct of this party, whatever the spirit that may have actuated it, will not stand the scrutiny of the chancellor. Equity seeks to do justice between the parties and to make them do right as between themselves, and it discountenances the dealings between the parties when one purposely and designedly throws a stumbling block in the way of his neighbor, and thereby (causes him), through his mistake, to suffer injury." 1 Story's Equity Jurisprudence (14 Ed.), 157, sec. 168.

We have a number of Tennessee cases that sustain this proposition: Goff v. Gott, 5 Sneed, 562; Harlan v. Central Phosphate Co. (Tenn. Ch. App.), 62 S. W., 614; Bell v. Steel, 2 Humph., 148; Trigg v. Read, 5 Humph., 533, 42 Am. Dec., 447; Cook v. Mfg. Co., 1 Sneed, 698; King v. Doolittle, 1 Head, 77.

Where a release is improperly obtained, a court of equity will restore the injured party to his rights. 1 Story's Equity Jurisprudence (14 Ed.), sec. 577.

It was not necessary for complainant to tender back the amount received when the policy was canceled in order to claim the difference between the amount paid and the amount then due. 6 Couch's Cyc. of Insurance Law, 5129, sec. 1448.

Hence three of the four assignments of errors are well made and are sustained.

The fifth assignment, that the court erred in holding that the judgment of the circuit court was res adjudicata, must be sustained, because the suit in the circuit court was instituted to recover only the past-due disability payments and refund of the premiums paid. The pleadings and the judgment only covered those items, hence the

judgment is not res adjudicata, and the complainant, Pearson, is not estopped on account of the settlement and receipt of the money.

"In order for a former judgment to be res adjudicata, the very point now raised must have been directly in issue. The question as to the right of complainant in this case to have its debt paid out of the proceeds of the policy, not having been raised and not having been in issue in the case in the federal court, that adjudication is not a bar to this suit." Provident Savings, etc., Soc. v. Duncan, 1 Tenn. Ch. App., 562; Gibson's Suits in Chancery, sec. 329.

■ The sixth assignment, that the court erred in holding that laches barred a recovery, must be sustained because the evidence showed that complainant did not know his rights and as soon as he was advised he instituted this suit.

"When there are circumstances excusing or justifying the delay, courts of equity will not refuse their aid." Gibson's Suits in Chancery, sec. 70.

■ The insured has a reasonable time in which to avoid a release of liability on a policy after the discovery of the fraud or mistake. 6 Couch's Cyc. of Insurance Law, 5128, sec. 1448, note 11.

"Laches cannot be invoked against a party, unless conditions have changed, and some innocent party, without knowledge of his rights, has become involved in the matter, and is about to suffer loss by reason of his neglect. See Parker v. Bethel Hotel Co., 96 Tenn., 252, 34 S. W. 209 [31 L. R. A., 706]." Prewitt v. Bunch, 101 Tenn., 742, 743, 50 S. W., 748, 753.

"Laches is always discountenanced. But delay alone, unaccompanied by other circumstances, will not necessarily preclude relief. Where the situation of the parties has not been altered, and one has not been put in a worse condition by the delay of the other, the defense of laches does not generally apply." Parker v. Bethel Hotel Co., supra.

Most of the assignments of errors having been sustained, it results that the decree must be reversed, and a decree will be entered here, setting aside the cancellation of the policy and reinstating it. A decree will also be entered here in favor of Pearson and against the insurance company for $15 per month from the date of the attempted cancellation, January, 1928, to the time when the bill was filed in this cause, June 15, 1932; $802.50, less $35.26, being the amount of the surrender value of the policy that he received. The $8.26 tendered and paid into the court will be returned to complainant Pearson. Interest will be allowed on the said sum of $802.50 from the date of the filing of the bill to the present.

"Where original bill sought damages for wrongful suspension by mutual benefit society or restoration to membership therein, and there

512

was no supplemental bill, held the pleading was not broad enough to warrant complainant's recovery of benefit installments accruing after date original bill was filed." Atkinson v. R. R. Emp. Mutual Relief Society, 160 Tenn., 158, 22 S. W. (2d) 631.

Where it appears that the court admitted and considered illegal testimony, material in its character, or misconceived the law applicable to the case, on a material question, his finding will be set aside and a new trial granted; and this court, without remanding the case, will determine it properly, and pronounce such judgment as the lower court should have rendered. Smith v. Hubbard et al., 85 Tenn., 306, 2 S. W., 569.

The cost of the cause including the cost of the appeal is decreed against the insurance company.

Faw, P. J., and DeWitt, J., concur.