[L. A. No. 16078. In Bank.—November 26, 1940.]

SOL GLICKMAN, Appellant, v. NEW YORK LIFE IN-
SURANCE COMPANY (a Corporation), Respondent.

Irving S. Baltimore and Abe Feldman for Appellant.

Meserve, Mumper & Hughes and E. Avery Crary for Respondent.

THE COURT.—This is an appeal by Sol Glickman from a judgment which was rendered against him as plaintiff in an action against the New York Life Insurance Company for rescission of a written surrender of a twenty-year endowment insurance policy, on the ground that the said surrender was procured by mistake and fraud.

In 1923, appellant, who was a native of Russia, resided in the city of New York. He was then twenty-one years of age. He had but a slight knowledge of the English language, although he later learned to read it. On February 23, 1923, at the instance of an insurance agent who was a friend of a member or members of his family, appellant purchased from the respondent company a $3,000 life insurance policy. By the provisions of that policy, semi-annual premiums of $78.48 became due on February 23d and August 23d of each succeeding year, and a thirty days' grace period was allowed in which to pay such respective premiums. The policy also contained a clause which provided that monthly disability benefits would be paid to the insured in the amount of one per cent of the principal sum named in the policy, which benefits would become effective upon receipt at the company's home office, before default in the payment of premium, of due proof of total and permanent disability of the insured. The section

of the policy which related to disability benefits also provided that all premiums falling due after approval of such proof of disability and during such disability would be waived. For ten years thereafter and until the spring of 1933 appellant paid all accruing premiums on the policy.

Several years after the policy was issued, appellant, who followed the upholstery trade, developed a serious physical affliction, and on that account moved from New York to the city of Los Angeles. Thereafter and for the period of a year or more prior to February, 1933, he was unable to work due to a condition of chronic arthritis, and he possessed no means with which to meet the insurance premium on his policy which would become due in that month. He had never read the policy and was not aware of the fact that it contained the disability clause, by the provisions of which he was entitled to receive $30 per month during such period as he might be wholly disabled, or that a further clause provided that payment of premiums would be waived while he suffered that incapacity. Also, due to his disability during 1932, appellant had been unable to pay property taxes and other obligations which he had incurred.

In January, 1933, appellant visited the office of the respondent insurance company in Los Angeles in connection with the negotiation of a loan on his $3,000 policy as well as on a $12,000 policy (which had been issued to him by the same company in 1926, and which contained a disability clause similar to the one contained in the $3,000 policy) in order that he might pay the premium then due on the larger policy. On that occasion he talked with a Miss Bush, an employee of the company, and informed her of his physical disability. In March of 1933, while appellant was still disabled, the premium on his $3,000 policy was delinquent, and due to the fact that the national bank moratorium was in effect he was unable to borrow money from any of the banks. On March 22, a day or two before his $3,000 policy would have lapsed because of nonpayment of premium, appellant again went to the insurance company's office. On that occasion he was introduced to Mr. Eagan Brantigan, who was a clerk in the employ of the company, whose duties included the collection of premiums and the acceptance of surrenders of policies. Appellant explained his physical and financial condition to Mr. Brantigan, and asked the latter whether he could

raise some money on the two policies with which to pay the premium as well as other pressing obligations. According to appellant's testimony, he said: *"I am disabled,* not feeling well and I can't do anything, I am not working and I simply haven't got any money. Now, can you figure out a way I can borrow some money here to pay my premium up? . . . I have no means any more to borrow, . . . the banks are closed, . . . scarcely can't get enough to get by to eat on; . . . I don't know where I am going to borrow it." (Emphasis added.) Appellant testified that Mr. Brantigan replied: "The only thing you can do, I guess, is to give the policy up"; that Mr. Brantigan told him if he would surrender the policy he would "get a few dollars out of it", and added: "You can't get cash unless you sign certain papers, because we are not allowed to pay out cash." Appellant testified that he replied: "If that is the only thing I can do, I guess I have to"; and that Mr. Brantigan then wrote out a request on the part of appellant for the surrender of the policy, and prepared a statement in which were set forth reasons for the making of that request, both of which papers were signed by appellant. The $3,000 policy was thereupon surrendered to the company. The surrender value of the policy was calculated to be about $80,—of which amount the sum of approximately $50 was applied by the insurance company to the reduction of a loan which appellant theretofore had negotiated on the $12,000 policy,—and on April 7, 1933, a check for the balance of $30 was sent to him. At the trial Mr. Brantigan testified that on the occasion hereinbefore mentioned he had talked with appellant at the insurance company's office and had accepted his written surrender of the $3,000 policy, but that he had no recollection of the conversation which had occurred between them at that time. Appellant's testimony in that respect, as hereinbefore quoted, is therefore uncontradicted except for the implication that might be said to arise by reason of the general rule to the effect that, ordinarily, appellant would be chargeable with knowledge of the contents of his policy.

It may be assumed that as a representative of the insurer Mr. Brantigan was familiar with the disability clause contained in the policy,—yet it appears that at the time he talked with appellant he failed to make the suggestion that appellant might file proof of his disability with the insurance company

and thereby procure monthly benefits in the sum of $30, or to apprise him of the fact that during the continuance of such disability all premiums falling due on the policy would be waived. To the contrary, according to appellant's testimony, Mr. Brantigan advised appellant that the only thing he could do was to *surrender his policy*.

There was testimony by a physician, who had treated appellant prior to 1933, to the effect that appellant was physically disabled and thereby prevented from performing any work after May, 1931; and the respondent insurance company stipulated at the trial that appellant was totally disabled during the entire period following October 1, 1932. Six months after appellant was induced by the insurer's representative to surrender his $3,000 policy, his physical condition became worse, and on October 9, 1933, he consulted with another physician, who advised appellant that he should undergo a series of diathermic treatments. Appellant responded that due to his straitened financial circumstances he would be unable to pay for such treatments. The physician then asked appellant if he did not have a life or health insurance policy which contained a disability provision. Appellant replied that he did not know, whereupon, at the request of the doctor, appellant brought to him the $12,000 insurance policy. After he had examined the policy the doctor advised appellant that it provided for monthly disability payments in the amount of one per cent of the principal sum thereof, and for a waiver by the insurer of all premium payments during the period of such disability. Appellant then consulted an attorney with respect to his rights under the policies, and thereafter he instituted a separate action in connection with each of the two policies. The action to secure disability benefits under the provisions of the $12,000 policy was subsequently compromised. In the instant action to rescind the surrender and cancellation of the $3,000 policy, trial was had and judgment was rendered against the insured on basic findings which, in effect were: That the policy was voluntarily surrendered in consideration of a cash payment, with knowledge on the part of the insured that it contained the disability clause; that appellant did not surrender it in reliance on the advice of the insurer's representative to the effect that there was no other course for him to pursue; and that the insurer

was not guilty of fraud or concealment with respect to procuring the surrender of the policy.

An examination of the record discloses no evidence to substantiate any of those findings—and they are without support except for the implication, hereinbefore mentioned, which might be said to arise by reason of the general rule that, ordinarily, one would be chargeable with knowledge of the terms of a written contract to which he has become a party. And, principally in reliance on the case of *Rice* v. *California Western States Life Ins. Co.*, 21 Cal. App. (2d) 660, 665 [70 Pac. (2d) 516], the respondent insurer contends that in view of the fact that appellant had the policy in his possession up to the time the representations were made to him, he must be presumed to have known its contents and, therefore, that he could not have been deceived by the representations of the insurer's clerk.

However, appellant urges that on consideration of all the circumstances hereinbefore set forth, judgment should have been rendered in his favor, on the basis that lack of due care on his part, if any, in not having read the policy should not be deemed a sufficient defense to the present action, which is predicated on the charge that appellant was wrongfully misled into surrendering his policy by reason of false and fraudulent representations of the insurer's representative with respect to appellant's rights thereunder. In that regard appellant relies on the cases entitled *Raulet* v. *Northwestern etc. Ins. Co.*, 157 Cal. 213 [107 Pac. 292], and *Golden Gate Motor Transp. Co.* v. *Great American Indemnity Co.*, 6 Cal. (2d) 439, 444 [58 Pac. (2d) 374], as authority for the proposition that the failure of an assured to read his insurance policy is not always to be deemed a defense to an action based on an assured's rights under the policy, particularly where, as here, the action is grounded on a charge of fraud on the part of the insurance company, by which the assured has been misled with respect to his said rights.

In the Golden Gate Motor Transport Company case, this court quoted with approval the following language which is set forth in the Raulet case: " 'It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies.

It is a matter almost of common knowledge that a very small percentage of policyholders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous . . . and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, and it is only just and equitable that the company should be required to call specifically to the attention of the policyholder such provisions as the one before us. The courts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent.' " (To the same effect, see, also, *Kavanaugh* v. *Franklin Fire Ins. Co.*, 185 Cal. 307 [197 Pac. 99].)

In the Kavanaugh case last cited, where attention was directed to the foregoing language from the Raulet case, in making the observation that insurance policies are "usually very lengthy and contain a great many conditions in language which is somewhat obscure to the layman", the court further remarked that the tenor of the decisions bearing upon the responsibility of the insurer in connection with the issuance of an insurance policy was to treat the policy more as a commodity than as a contract, and that to that end rules had been evolved which were not applicable to ordinary contracts.

Also, in the case of *Pearson* v. *Mutual Life Ins. Co. of New York*, 17 Tenn. App. 503 [68 S. W. (2d) 963], the facts closely coincide with those now before this court. There it appeared that the insured and his mother were misled by the insurer's agents who demanded payment of insurance premiums notwithstanding the fact that the insurance company had notice and proof of a mental disability which the insured had developed; and that, under the belief that the policy would lapse for nonpayment of premiums, the insured had requested the insurer to cancel the policy and pay to him its cash surrender value. Subsequently, the insured brought an action against the insurer in an effort to have the policy reinstated, and in ruling that he was entitled to have the cancellation rescinded, the court said: "But it is shown

by the record that neither Pearson nor his mother knew what his rights under the policies were, and there is no evidence to the contrary. They were misled by the company's agents in November, 1926, when they were required to pay premiums. When the premiums fell due in 1927 they were threatened with the lapse of the policies unless the premiums were paid. The company had the information that Pearson was totally incapacitated and knew that he was entitled to draw a monthly payment of $15 a month for the rest of his life without further payment of premiums, yet it canceled the policy, paying Pearson about $36 in full. . . . The only part the insurance company played in bringing about this cancellation was in demanding premiums when it knew he was totally incapacitated and in failing to inform him that premiums were waived under such circumstances. This suppression of material facts was a virtual fraud upon him. 1 Story's Equity Jurisprudence (14th ed.) 488, sec. 512. The oppressive bargain made by the insurance company was a constructive fraud. 1 Story's Equity Jurisprudence, (14th ed.) 434, sec. 452. 'Relief from a settlement and compromise of a claim for insurance will be granted where insured acted without any real consideration, in ignorance of the rights and obligations of the parties, while insurer had full knowledge thereof, and of his ignorance, and induced him to act by false and fraudulent misrepresentations, although the mistake was in respect to his legal rights. Where it sufficiently appears that through fraud and mistake a person has made a written surrender of a valuable right, or has released a subsisting cause of action, he may repudiate the same, even if the demands so released are disputed or unliquidated, and notwithstanding the mistake was not merely one of fact, but one of law as to the legal effect of a written instrument which operates as a gross injustice to one party and gives to the other an unconscionable advantage.' 6 Couch's Cyc. of Insurance Law, 5126, 5127, sec. 1448.''

As was stated in the Raulet case, hereinbefore cited, it is perhaps generally known that but a comparatively small number of policyholders read such a contract in its entirety,— that it is rarely understood by the person who pays the premiums (*Coniglio* v. *Connecticut Fire Ins. Co.*, 180 Cal. 596, 599 [182 Pac. 275, 5 A. L. R. 805]) due to the reasons heretofore mentioned, and that ordinarily the policyholder makes

little more than a superficial examination of the document at the time the policy is issued. In the present case, as hereinbefore has been indicated, the insured had been in this country but a short time before he obtained the policy, at which time he had but a scant knowledge of the English language. Under such circumstances, it is doubtful whether he would have understood the phraseology employed therein had he then been able to read the policy. However, he paid the premiums on the policy for a period of ten years thereafter and until February, 1933, when, due to his physical disability he had no funds with which to pay the premium then about to become due. The evidence shows that at no time prior to his conversation with Mr. Brantigan in March, 1933, and not until some months later, was he aware of the fact that his policy contained a provision for monthly disability payments, and that it also provided for a waiver of premium payments during the period that such disability benefits were being received by him. It therefore would be manifestly unjust, in this equitable action, to rule that the representations of the insurer's agent,—by which the insured was misinformed and misled with regard to his rights,— should operate to the prejudice of the insured. And ▪ where, as here, a policyholder has approached his insurer with a request for advice concerning his rights under the policy,—if the agent of the insurer *undertakes to advise him,* —at least it should be the duty of such representative to make no false or misleading statement in that respect. Particularly should that be a requirement on the part of the insurer, or its agents, where, as in the present case, the information sought and given might have a direct and material bearing on the continuance of the life of the policy. In the instant case, ▪ the false and misleading statements of the insurer's representative as to the asserted rights of the insured under the policy not only operated to deprive the insured of one of the principal benefits accorded him by his contract, but they also resulted in a substantial gain to the insurer. In legal effect, such representations amounted to constructive fraud. (Sec. 1573, Civ. Code; *Hargrove* v. *Henderson,* 108 Cal. App. 667, 673 [292 Pac. 148]; 12 Cal. Jur. p. 710, and cases there cited.)

▪ Contracts of insurance should be viewed in the light of their general objects and purposes, including the legitimate

conditions prescribed by the insurer (*Raulet* v. *Northwestern etc. Ins. Co.,* 157 Cal. 213 [107 Pac. 292]). In general, the object and purpose of insurance is to indemnify the insured in case of loss, and ordinarily such indemnity should be effectuated rather than defeated. To that end the law makes every rational intendment in order to give full protection to the interests of the insured. (1 Couch, Cyc. of Ins. Law, p. 402 et seq.) ■ Policies of insurance create reciprocal rights and obligations, and the relationship created between the contracting parties should be characterized by the exercise of mutual good faith. (1 Couch, Cyc. of Ins. Law, p. 408; see, also, *McElroy* v. *British America Assur. Co.,* 94 Fed. 990, 1000 [36 C. C. A. 615].) An insured is entitled to the protection which he buys and for which he pays substantial premiums. (*Wade* v. *Mutual Ben. Health & Acc. Assn.,* 115 W. Va. 694 [177 S. E. 611, 614].) And ■ where a release of a contract right is improperly obtained, a court of equity will restore the injured party to his rights. (1 Story's Eq. Jur., 14th ed., p. 543; *Pearson* v. *Mutual Life Ins. Co. of New York,* 17 Tenn. App. 503 [68 S. W. (2d) 963].)

From the foregoing, it follows that since the surrender of appellant's policy was without virtual consideration, due to his reliance on the false and misleading representations of the insurer's agent, the judgment by which appellant was denied a rescission of his agreement of surrender should be and it hereby is reversed.

Shenk, J., and Edmonds, J., did not participate in the consideration and decision of this case.

Rehearing denied.