[L. A. No. 26927. In Bank. Dec. 18, 1962.]

KATHRYN E. STEVEN, Plaintiff and Appellant, v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK et al., Defendants and Respondents.

---

*Assigned by Chairman of Judicial Council.

Gerald H. Gottlieb, John W. Preston, Jr., and Arthur Magid for Plaintiff and Appellant.

Crider, Tilson & Ruppé, Edward A. DeBuys and Henry E. Kappler for Defendants and Respondents.

TOBRINER, J.—We point out here why we have concluded that the provisions of an airplane trip insurance policy on the life of the beneficiary's husband did not plainly or clearly provide for noncoverage, and why, in the absence of such provision, in this unusual case, the insurer is liable. Accordingly, we do not believe that the judgment for the insurer, rendered after trial without a jury, should stand.

On March 3, 1957, Mr. George A. Steven purchased at Los Angeles, California, a round-trip airplane ticket to Dayton, Ohio. As part of the return trip Mr. Steven's itinerary included a flight from Terre Haute, Indiana, to Chicago, Illinois. Mr. Steven simultaneously purchased for a premium of $2.50 a $62,500 life insurance policy which named his wife, appellant, as the beneficiary.

Mr. Steven bought the policy by means of a vending machine. The policy set out across the top the following specifications: "DO NOT PURCHASE MORE THAN A TOTAL OF $62,500 PRINCIPAL SUM—NOR FOR TRAVEL ON OTHER THAN SCHEDULED AIR CARRIERS. THIS POLICY COVERS ON ONE-WAY TRIP ONLY UNLESS ROUND TRIP TICKET IS PURCHASED BEFORE DEPARTURE." Below this printed statement a box form provided for the insertion on appropriate lines of the insured's name, the name and address of the beneficiary, the point of departure and destination, the extent of the trip as on a one-way or round-trip ticket, the date, the principal sum of insurance ($62,500), the amount of the premium ($2.50), and the insured's signature. The evidence does not clearly show whether at the time of purchase the aperture of the vending machine disclosed the entire top portion of the policy, including the printed warning as to amount and coverage for travel on "scheduled air carriers," or merely the form for the personal data and flight information to be furnished by the purchaser. After obtaining the policy, Mr. Steven, using the envelope provided by the machine, mailed it to his wife.

On March 6, 1957, on his return trip from Dayton, Mr. Steven, according to his original plan, stopped off at Terre Haute. He arrived there between 7 and 8 o'clock in the morning. His round-trip ticket scheduled him to take a Lake Central Airlines plane to Chicago at noon that day. At about that time the public address system at the airport announced that the Lake Central plane had been grounded in Indianapolis and that there would be some delay. After several further announcements of repeated delays, the scheduled Lake Central flight to Chicago was finally cancelled at 4:30 p. m.

The agent of Lake Central Airlines then attempted to arrange for Mr. Steven and three other men substitute means of transportation to Chicago. The agent phoned railroads, bus lines and even an automobile rental company. After concluding that he could not thereby arrange a connection with the scheduled Chicago flight to Los Angeles, the agent took Mr. Steven and the other three men to the office of the Turner Aviation Corporation (hereinafter designated Turner) at the Terre Haute airport and introduced them to the agent there in charge. The Lake Central agent indicated that a flight on a Turner plane provided the only means for Mr. Steven to make his scheduled connection with the Chicago plane, a connection which Mr. Steven particularly desired because an essential work project awaited him in Los Angeles the next morning. Turner agreed to fly the men to Chicago for $36 per person, or, if two more passengers could be obtained, for $21 a person. Two additional passengers were obtained and accordingly Mr. Steven and each of the other passengers paid Turner $21 for his ticket.

Mr. Steven boarded the Turner aircraft, a Piper Tri-Pacer airplane, which took off from the Terre Taute airfield at 5:55 p. m. Some time around 7 p. m. on March 6, 1957, near Grant Park, Illinois, the plane crashed. Mr. Steven suffered fatal injuries.

During March 1957 Turner operated out of Terre Haute under an air-taxi certificate issued either by the Civil Aeronautics Board or the Civil Aeronautics Administration. As of the date of the crash, Turner held no certificate of public convenience and necessity from the Civil Aeronautics Board, the governmental authority empowered to issue such certificates. Neither the State of Illinois nor the State of Indiana grants certificates of public convenience and necessity or other authorization to air carriers of any kind. During March 1957 Turner did not publish schedules and tariffs for regular passenger service between named cities within the boundaries of either Illinois or Indiana at regular and specified times. The plane trip on which the accident occurred was not a regular and scheduled flight of Turner.

The trial court found that the deceased at the time of the accident "was not riding as a passenger on an aircraft operated by a scheduled air carrier, as defined in [the] policy,[1]

---

[1]The policy provides in part:

"1. INSURING CLAUSE. Ticket or Pass Requirement. The Company will pay the benefits specified below if during the term of this policy the

and further . . . that he was riding a charter plane from Terre Haute, Indiana, to Chicago, Illinois,'' and concluded that appellant could not recover on the policy.

Applying the principle that ambiguous clauses in insurance policies are to be interpreted against the insurer, we believe, for the reasons we shall set out, the provisions of the policy both as to coverage for a substituted flight and as to coverage for scheduled air carriers must be held to impose liability upon the insurer. We shall also explain why we have concluded that Mr. Steven's failure to exchange his ticket at Terre Haute does not absolve the insurer from such liability.

The special circumstances of this case establish a second reason for our conclusion that the insurer cannot successfully claim that the policy did not cover the substituted transportation. ▮ In this type of standardized contract, sold by a vending machine, the insured may reasonably expect coverage for the whole trip which he inserted in the policy, including reasonable substituted transportation necessitated by emergency. If the insurer did not propose such coverage, it should

Insured suffers loss resulting directly and independently of all other causes from accidental bodily injury (hereinafter referred to as 'such injury') sustained under circumstances specified below during the first one-way or round airline trip taken by the Insured after the purchase of this policy on Aircraft Operated by a Scheduled Air Carrier as defined below from the Point of Departure to the Destination, both shown above, and return if round trip ticket is obtained before departure, provided that at the time that the Insured sustains such injury he is traveling on a transportation ticket or pass covering the whole of said airline trip, issued to him for transportation on an aircraft operated by a scheduled air carrier.''

''4. DEFINITION OF AIRCRAFT OPERATED BY A SCHEDULED AIR CARRIER. The words 'Aircraft Operated by a Scheduled Air Carrier' as used in this policy, mean and are defined as follows: (1) aircraft of United States registry, operated on a regular, special or chartered flight by a scheduled air carrier holding a certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of the United States of America, or its successor, and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times, or (2) aircraft of foreign registry . . . or (3) aircraft of United States registry operated on a regular scheduled flight solely within the boundaries of a State of the United States by a scheduled air carrier legally authorized to conduct such operation, and which files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities solely within the boundaries of such State at regular and specified times. Specifically excluded from the above definition of 'Aircraft Operated by a Scheduled Air Carrier' are any and all aircraft operated by scheduled military airlines and any and all aircraft operated by air carriers recognized, designated, licensed or determined by the governmental authority having jurisdiction over civil aviation as being irregular or non-scheduled air carriers.''

have plainly and clearly brought to the attention of the purchaser such limitation of liability.

We turn to the first point. We must determine whether, when Mr. Steven faced the necessity of arranging substituted transportation at Terre Haute, the policy afforded him clear notice of noncoverage of such substituted transportation. We examine the question in the light of the purpose and intent of the parties in entering into the contract,[2] Mr. Steven's knowledge and understanding as a reasonable layman,[3] his normal expectation of the extent of coverage of the policy and the effect, if any, of the substitution of the transportation upon the risk undertaken by the insurer.[4]

The purpose and intent of the insured in taking out the insurance was to obtain insurance protection for the trip. The insured could fairly believe that the policy would cover a reasonable emergency substitution necessitated by the exigencies of the situation. Since weather conditions and mechanical failure upon not infrequent occasions require such substitution, the insured would not ordinarily expect that his insurance would fail in the event of these foreseeable contingencies. Since his contract covered the *trip,* he would not contemplate a hiatus in coverage; he bargained for protection for the whole, not part of, the trip.

A reasonable person, having bought his ticket for a fixed itinerary, and thus having at the moment of purchase of the policy gained insurance protection for the whole trip, would normally expect that if a flight were interrupted by breakdown or other causes, his coverage would apply to substi-

---

[2]See *Blackburn* v. *Home Life Ins. Co.* (1941) 19 Cal.2d 226, 229 [120 P.2d 31]; *Protex-A-Kar Co.* v. *Hartford Acc. etc. Co.* (1951) 102 Cal. App.2d 408, 412 [227 P.2d 509]; *Carl Ingalls, Inc.* v. *Hartford Fire Ins. Co.* (1934) 137 Cal.App. 741, 745-746 [31 P.2d 414].)

[3]*Freedman* v. *Queen Ins. Co.* (1961) 56 Cal.2d 454 [15 Cal.Rptr. 69, 364 P.2d 245]; *Arenson* v. *National Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81 [286 P.2d 816]; *Ransom* v. *Penn Mutual Life Ins. Co.* (1954) 43 Cal.2d 420 [274 P.2d 633]; *Hobson* v. *Mutual Benefit Health & Acc. Assn.* (1950) 99 Cal.App.2d 330 [221 P.2d 761]; *Gaunt* v. *John Hancock Mut. Life Ins. Co.* (2d Cir. 1947) 160 F.2d 559.

[4]*Ransom* v. *Penn Mutual Life Ins. Co., supra; New York Life Ins. Co.* v. *Hollender* (1951) 38 Cal.2d 73 [237 P.2d 510]; *Foley* v. *Sonoma County etc. Ins. Co.* (1941) 18 Cal.2d 232 [115 P.2d 1]; *Coniglio* v. *Connecticut Fire Ins. Co.* (1919) 180 Cal. 596 [182 P. 275, 5 A.L.R. 805]; *Maryland Cas. Co.* v. *Industrial Acc. Com.* (1918) 178 Cal. 491 [173 P. 993]; *Arnold* v. *American Insurance Co.* (1906) 148 Cal. 660 [84 P. 182, 25 L.R.A. N.S. 6]; *Lagomarsino* v. *San Jose etc. Title Ins. Co.* (1960) 178 Cal.App.2d 455, 464 [3 Cal.Rptr. 80]; *Carl Ingalls, Inc.* v. *Hartford Fire Ins. Co., supra; Granger* v. *New Jersey Ins. Co.* (1930) 108 Cal.App. 290 [291 P. 698].

tute transportation for the same flight. If, for instance, the scheduled plane crash-landed, he would certainly assume that the policy covered the emergency relief plane whether or not it were a scheduled air liner. The same normal expectation would apply to the substitution of an alternate plane because the scheduled one had been grounded by mechanical failure.

■ The risk of injury on the substitute conveyance in many cases will be no greater than the risk on the scheduled flight; in all cases it will be less than if the scheduled airline attempts to fly the scheduled flight despite bad weather or mechanical difficulty. Thus, both in the terms of occurrence and magnitude of risk, substitute emergency transportation falls well within the obligation undertaken by the insurer.

■ The language of the policy does not specifically exclude the expected coverage for the substituted flight. Neither the insuring clause, the definitions of a scheduled air carrier nor section 3(b) *infra* negates, without ambiguity, protection for the emergency substitute flight.

The insuring clause alludes to a loss occurring "during the first one-way or round airline trip taken by the Insured after the purchase of this policy on Aircraft Operated by a Scheduled Air Carrier as defined below. . . ." and does not mention the subject of substitution of another carrier in the event of breakdown. Section 4, which defines "aircraft operated by a scheduled air carrier" differentiates between the scheduled and nonscheduled carriers but likewise does not describe the accorded coverage if an emergency causes the use of a nonscheduled carrier. These sections provide that the policy applies, as the heading in the box states, to the "round trip ticket . . . purchased before departure." Mr. Steven complied with these requirements: he purchased the round trip ticket on the scheduled airliner, and, when initially ensconced upon his plane, enjoyed the protection of his policy.

The only allusion to substituted transportation in the policy, contained in clause 3(b), does not in and of itself exclude coverage for the Turner flight. This provision affirmatively extends coverage to injuries sustained "while riding in or on a land conveyance provided or arranged for, directly or indirectly, by such scheduled air carrier . . . for the transportation of passengers necessitated by an interruption or temporary suspension of such scheduled air carrier's service. . . ." It thus makes clear that, at least in some cases, substitute emergency transportation will be included in the policy, and that, despite the narrowing of the insuring clause of the policy

to "Aircraft Operated by a Scheduled Air Carrier," coverage may be extended to a nonscheduled nonflying vehicle not operated by an air carrier.

The crucial issue resolves into whether the limitation of that extension to "land conveyances" sufficiently overcomes the normal expectation that coverage would extend *to any reasonable form of substitute conveyance.* The clause clearly does not specifically *exclude* substitute emergency aircraft; it does not mention nonland conveyances at all. An inference of such noncoverage could arise only with the aid of the rule of construction *expressio unius est exclusio alterius;* i.e., that mention of one matter implies the exclusion of all others.

We do not believe the application of the maxim can resolve the present case. The maxim serves as an aid to resolve the ambiguities of a contract. If we invoke the *expressio unius* approach, we must necessarily thereby recognize the ambiguity of the contract; in that event other legal techniques for the resolution of ambiguities, including the rule that they should be interpreted against the draftsman, also come into play. Thus *McNee* v. *Harold Hensgen & Associates* (1960) 178 Cal. App.2d 881 [3 Cal.Rptr. 377], holds that if the applicability of a contract provision can be determined only by use of the maxim *expressio unius,* the contract is ambiguous, and extrinsic evidence is therefore admissible to prove the intent of the parties.

The rule of resolving ambiguities against the insurer does not serve as a mere tie-breaker; it rests upon fundamental considerations of policy. ■ In view of the somewhat fictional nature of intent in standardized contracts, the considerations which support the rule that ambiguities in the policy are to be interpreted against the insurer are more compelling than those which prompt the application of the mechnical *expressio unius* maxim. We do not believe the maxim should serve to defeat the basic rule that the insurance contract should be interpreted against the draftsman.

■ In any event, the maxim of *expressio unius,* which is surely a legalistic concept, hardly enters into the thinking of the reasonable layman. As we have stated, we interpret an insurance contract in the light of that understanding. We could not logically conclude that when Mr. Steven, unversed in legal abstractions, boarded the Turner plane at Terre Haute, he invoked this maxim of interpretation.

The facts of this case buttress the above conclusion. Mr. Steven planned a round trip entirely on scheduled air car-

riers; he purchased his policy with the expectation that it would provide insurance against death or injury in such contingencies as might arise in the course of such a trip. In Terre Haute, Mr. Steven, upon learning that the Lake Central flight had been cancelled, exhausted all of the possibilities of obtaining substitute land transportation. He could complete his original itinerary only by the Turner flight. Indeed, the Lake Central agent suggested the Turner substitution, took him over to the Turner office and introduced him to the Turner agent. While the policy specified coverage for injuries suffered in a *land* conveyance provided by the scheduled carrier, it contains no statement whatsoever as to such substituted *air* conveyance. We do not see how such verbal vacuity can serve as clear and plain notice to the insured of noncoverage.[5]

We therefore conclude that section 3(b) should not be interpreted to restrict coverage exclusively to land conveyances. The policy did not clearly notify Mr. Steven that in spite of his expectation, and in view of the intention of the parties in entering into the contract, the coverage did not extend to a substitute flight in the event of emergency. The provision for substitute transportation did not clearly overcome the normal expectation that coverage would extend to *any reasonable form of substitute conveyance.*

Turning to the second aspect of the policy which affects the substituted Turner flight, that is, the definition of scheduled air carrier, we find that it, too, created an ambiguity and failed to apprise Mr. Steven of the asserted noncoverage.

The definition, set out in the fourth provision of the policy, states: "The words 'Aircraft Operated by a Scheduled Air Carrier' as used in this policy, mean and are defined as follows: (1) aircraft of United States registry, operated on a

[5]*Thompson* v. *Fidelity & Cas. Co. of New York* (1958) 16 Ill.App.2d 159 [148 N.E.2d 9] (cert. den. 358 U.S 837 [79 S.Ct. 62, 3 L.Ed.2d 74]), and *McBride* v. *Prudential Ins. Co. of America* (1947) 147 Ohio St. 461 [72 N.E.2d 98], the two leading cases denying recovery for deaths on nonscheduled airlines, *did not involve substitute emergency transportation.* In both cases the insured *initially* planned to fly on a nonscheduled line. Moreover, even in *Lachs* v. *Fidelity & Cas. Co. of New York* (1954) 306 N.Y. 357 [118 N.E.2d 555], which grants recovery to the insured, the insured *purchased* transportation on a nonscheduled line despite the availability of a scheduled air carrier. While in *Lachs* the insured may have been deceived by the location of the vending machine in front of the nonscheduled lines counter, the situation confronting Mr. Steven at Terre Haute would be even more likely to induce an expectation of protection.

*regular,* special or chartered flight by a *scheduled air carrier* holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board. . . and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times. . . . Specifically *excluded* from the above definition of 'Aircraft Operated by a Scheduled Air Carrier' are any and all aircraft operated by scheduled *military airlines* and any and all aircraft operated by air carriers recognized, designated, licensed or determined by the governmental authority having jurisdiction over civil aviation as being *irregular or non-scheduled* air carriers.'' (Emphasis added.)

The regulations of the Civil Aeronautics Board do not divide airlines into scheduled and nonscheduled carriers but, instead, establish a number of classifications. One class consists of carriers holding board certificates of convenience and necessity; airlines of this class comply completely with the definition in the policy of ''scheduled air carrier.'' On the other hand, the only classification which contains the designation ''irregular or non-scheduled air carriers'' is that of ''large irregular carriers,'' which is defined in 14 Code of Federal Regulations section 291.1 as carriers flying planes of more than 12,500 lbs. weight without certificates of public convenience and necessity, and not flying regular routes.[6]

Turner Aviation did not fall within either of the above classifications. Instead, it held a certificate as an air-taxi operator, defined in 14 Code of Federal Regulations section 298.3 as a carrier using planes of less than 12,500 lbs. weight and

---

[6]Section 291.1 of 14 Code of Federal Regulations reads as follows:

'' (a) *Large irregular carriers.* The term large irregular air carrier means any air carrier which (1) directly engages in air transportation, (2) utilizes in such transportation one or more aircraft of more than 12,500 pounds maximum certificated take-off weight (as defined in § 42.1 of this title), (3) does not hold a certificate of public convenience and necessity under section 401 of the Civil Aeronautics Act of 1938, as amended, and (4) does not operate, or hold out to the public expressly or by course of conduct that it operates, one or more aircraft between designated points, or within a designated point, regularly or with a reasonable degree of regularity, upon which aircraft it accepts for transportation, for compensation or hire, such members of the public as apply therefor or such property as the public offers. No air carrier shall be deemed to be an irregular air carrier unless the air transportation services offered and performed by it are of such infrequency as to preclude an implication of a uniform pattern or normal consistency of operation between, or within, such designated points.''

not having a certificate of public convenience and necessity.[7] The definition of air-taxi carrier does not mention regularity of flights; with certain exceptions not here pertinent an air-taxi carrier may, without obtaining a certificate of public convenience and necessity, publish and maintain schedules for regular passenger service. Turner, however, did not publish schedules. No evidence was introduced to show whether Turner maintained regular service, although 14 Code of Federal Regulations section 298.21, which prohibits air-taxi operators from holding out to perform "regular" service in competition with scheduled helicopter service, appears to make maintenance of regular schedules the distinction between "regular" and "irregular" air-taxi service.

Since Turner did not file and publish regular schedules, nor possess a certificate of public convenience and necessity, Turner does not fall under the literal affirmative definition of scheduled air carrier in the policy. Neither does Turner qualify under the exclusionary language in the last sentence of clause 4; it was not a military airline and was not designated by government regulations as an irregular carrier. Thus the negative definition of the term in the exclusionary phrase may serve to *extend* coverage to all types of air transport except the two that were specifically excluded.[8]

In summary, the air-taxi carrier constitutes a third category of aircraft under the federal regulations; the air-taxi is neither a scheduled carrier nor a nonscheduled carrier. So regarded, air-taxi carriers are neither included in, nor excluded from, the coverage of the policy; clause 4 creates an

---

[7]Section 298.3 of 14 Code of Federal Regulations reads as follows:

"(a) There is hereby established a classification of air carriers, designated 'air taxi operators' which engage in the direct air transportation of passengers and/or property and which:

"(1) Do not utilize aircraft having a maximum takeoff weight of more than 12,500 pounds in air transportation.

"(2) Do not hold a certificate of public convenience and necessity or other economic authority issued by the Board.

"(b) A person who does not observe the conditions set forth in paragraph (a) of this section shall not be an air taxi operator within the meaning of this part with respect to any operations conducted by him while such conditions are not being observed, and during such periods is not entitled to any part of the exemptions set forth in this part."

[8]The argument that if a risk is not included in the insuring clause the court need not look to see if it is excluded in a later exclusionary clause is not applicable to this case. Both the inclusionary and the exclusionary definitions of scheduled air carrier are found in clause 4, the whole of which clause is a definition of that term as used in the insuring clause (clause 1).

ambiguity. "The burden in such a case as this is on the defendant to establish that the words and expressions used not only are susceptible of the construction sought by defendant but that it is the *only* construction which may fairly be placed on them." (*Lachs* v. *Fidelity & Cas. Co., supra*, 118 N.E.2d at p. 555; emphasis added.) This burden has not been met.[9]

 Nor does the claim of the beneficiary here founder upon the provisions of the policy which require an exchange of tickets. The insurer argues that Mr. Steven lost the protection of the policy because he purchased a ticket from Turner and travelled under that ticket at the time of the crash. Respondent posits this position upon two policy provisions: (1) the requirement in the last three lines of the insuring clause "that at the time that the Insured sustains such injury he is traveling on a transportation ticket or pass covering the whole of said airline trip issued to him for transportation on an aircraft operated by a scheduled air carrier"; (2) the requirement in clause 2 that on substituted flights "the transportation ticket or pass issued to the Insured for said first airline trip has been exchanged for another ticket or pass issued for transportation on an aircraft operated by a scheduled air carrier on the substituted trip."

We doubt the applicability and effectiveness of these requirements. Neither refers to substitute transportation taken because of the cancellation of a scheduled flight. Clause 2 applies to "a change in itinerary." No change in itinerary occurred here; Mr. Steven took the substitute flight to com-

---

[9] Again a comparison of the facts in the present case with those in *Thompson, McBride,* and *Lachs* reinforces the relative strength of appellant's claim. In none of those cases does it appear that the insured flew on an air-taxi carrier as distinct from a large irregular carrier. In *Lachs* the airline was classified as a large irregular carrier (see 118 N.E. 2d at pp. 559 and 563 (dissenting opinion)); the opinions in *Thompson* and *McBride* do not give adequate information to reach a conclusion as to the airline's certification.

Respondent's suggestion that *Lachs* should be distinguished because there the ambiguous phrase was "Civilian Scheduled Airlines" instead of "Scheduled Air Carrier" cannot be accepted. Respondent cites the finding in *Lachs* that "if decedent had engaged a lawyer to examine the Civil Aeronautics Act of 1938 as amended and the Code of Federal Regulations before purchasing her policy, she would have learned . . . that the term Civilian Scheduled Airline cannot be found in them and there is no such terminology used." (118 N.E.2d at p. 559.) But the opinion goes on to point out that "There is also no reference to nor mention of the words 'Scheduled Airline' in the Code of Federal Regulations. There is no definition of 'Scheduled Airline' or of 'Non-scheduled Airline' in the Civil Aeronautics Act of 1938 as amended. . . ." (*Ibid.*)

plete the itinerary. The policy limitation, reasonably interpreted, refers to the situation in which a passenger freely chooses to change his original itinerary, not to the contingency in which he seeks to follow it, and in order to do so obtains alternate transportation because of flight cancellation.

Both clauses were considered in the cases of *Fidelity & Cas. Co. of New York* v. *Smith* (10th Cir. 1951) 189 F.2d 315 [25 A.L.R.2d 1025], and *Rosen* v. *Fidelity & Cas. Co. of New York* (E.D. Pa. 1958) 162 F.Supp. 211. In these cases the courts noted that airlines did not customarily accept unused tickets on other lines or issue substitute tickets covering the whole of the trip. Indeed, in *Smith* the court found that it was impossible to exchange tickets. Both courts further noted that the risk would not be affected in the slightest degree by whether or not the passenger exchanged his ticket, cancelled it and used the proceeds to buy substituted transportation, or merely bought the substituted transportation with the expectation of obtaining a later refund. Both courts concluded that the provisions in question would not bar recovery.

Respondent argues that *Smith* and *Rosen* are distinguishable in that there the substituted flights were on scheduled carriers. But the rationale of those cases rests upon the fact that compliance with the ticket exchange requirement is difficult or impossible, and that compliance does not materially affect the insurer's risk. Compliance is no easier with a nonscheduled than a scheduled airline, and even if, as respondent contends, nonscheduled airlines entail a greater risk, surely that risk is not increased by the failure of the passenger to exchange his ticket. Whatever reason there may be to deny liability for injuries occurring on flights of nonscheduled carriers, it can bear no reasonable relation to the enforcement of a ticket exchange requirement for nonscheduled lines and not for scheduled lines.

Whether or not a passenger has exchanged his ticket does not remotely increase the risk borne by the company; furthermore, the exchange of tickets is unusual and at times impossible. Hence the enforcement of the requirement would convert a clause which seemingly extends coverage of the policy for substituted flights into one which denies coverage except in highly unusual situations. Since in the present case appellant asserts, and respondent does not deny, that compliance with the ticket exchange requirement would have been impossible, we conclude that this requirement in the circumstances of this case cannot fairly be enforced against appellant.

If the classic rules of interpretation lead to the conclusion that the policy afforded coverage here, we must point out additionally that they apply with special force in the circumstances of this case. We do not deal here with the orthodox insurance policy sold in the protective aura of the insurer's explanation and discussion of its terms. The vending machine emitted a complex stereotyped document, which, because of the short time elapsing before the start of Mr. Steven's flight, hardly afforded him an opportunity even to read the policy. The mass-made contract, sold by the machine under such conditions, symbolizes the kind of transaction that lends to the accepted rules a special gloss of interpretation. As we shall explain in more detail, the cases have held that in such contracts the expected coverage of the policy can only be defeated by a provision for limitation which has been plainly brought to the attention of the insured.

Nothing in the instant contract or transaction apprised the insured that the protection of the policy would not extend to the substituted emergency flight. The manner of sale of the policy negated any possibility of such notice. The inanimate machine told the purchaser nothing, and even if he had wanted to ask about the coverage in the event of emergency, the box could not have answered. While the testimony leaves us in some doubt as to whether Mr. Steven saw the words in the window of the machine stating "Nor for travel on other than Scheduled Air Carriers," we know that if he did see them, he could neither have read the definition of "scheduled air carrier" nor the clause concerning substitute emergency transportation on "land conveyances." These clauses lay hidden behind the mechanized face of the vendor. Even after Mr. Steven purchased the policy he would only have found such clauses among the many complexities of the instrument. They were inconspicuous clauses, and, as we have stated, they were unclear.

To assume that Mr. Steven read the provisions, or conceivably understood them, is to rest upon hypothesis rather than fact. The insurer *instructed* the purchaser to mail the policy to the beneficiary and provided envelopes for this purpose. Like most purchasers, Mr. Steven, before boarding the plane at the very commencement of the trip, did mail the policy to the beneficiary. The company provided no duplicate. Thus, when Mr. Steven found it necessary at Terre Haute to take the Turner flight he could not have consulted the policy to determine its applicability. Instead, even assuming that

three days earlier he had read it carefully, he would have been compelled to rely upon his memory. The policy is about 2,000 words long. It is so tightly drawn that if Mr. Steven had forgotten a single word in clause 3(b) or a short phrase in clause 4 he might well have concluded that the policy covered the Turner trip.

Even upon the highly unrealistic assumption that Mr. Steven surmounted all of these obstacles, the policy still would not have notified him that he was not covered. The policy, in defining scheduled airlines, refers to an airline possessing certificates of public convenience and necessity and filing schedules. Later it attempts to exclude lines designated in government regulations as irregular or nonscheduled. These facts, important in determining whether the Turner flight were covered, obviously do not compose the facts a passenger typically knows. "[T]he average man . . . is [not] expected to carry the Civil Aeronautics Act or the Code of Federal Regulations when taking a plane." (*Lachs v. Fidelity & Cas. Co., supra*, 118 N.E.2d at p. 558.) Neither can he generally be expected to inquire into the nature of the certification of the airline.

The company so arranged this transaction that Mr. Steven could not possibly read the policy before purchase and could not practically consult the policy after purchase. The language of the policy in itself was insufficient to afford the necessary notice of noncoverage. The facts of the case foreclose any contention of the company that it afforded Mr. Steven plain warning of noncoverage of the Turner flight. █ While the insurer has every right to sell insurance policies by methods of mechanization, and present-day economic conditions may well justify such distribution, the insurer cannot then rely upon esoteric provisions to limit coverage. If it deals with the public upon a mass basis, the notice of noncoverage of the policy, in a situation in which the public may reasonably expect coverage, must be conspicuous, plain and clear.

█ Finally, the one provision that deals with substitution of transportation in the event of emergency, section 3(b) of the policy, was not only hidden beneath the machine before purchase, and, subject after purchase, to obscurity and ambiguity, but literally applied, tended toward the harsh and unconscionable. The section states that coverage for "the transportation of passengers necessitated by an interruption or temporary suspension of such scheduled air car-

rier's service before arrival at destination'' is limited to ''riding in or on a *land conveyance* provided or arranged for, directly or indirectly, by such scheduled air carrier'' (emphasis added). Yet innumerable flights traverse bodies of water; if a plane were forced down at such a point and the scheduled carrier arranged for conveyance by water, the language would not apply. Indeed, if the plane were forced down upon land or water and relief was afforded by a chartered nonscheduled carrier, which, of course, is a very likely contingency the language again would not apply. Does not such a provision approach a trap for the unwary purchasing public?

In standardized contracts, such as the instant one, which are made by parties of unequal bargaining strength, the California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable. The attitude of the courts has been manifested in many areas of contract.

This approach has been applied to insurance contracts. Thus in *Raulet* v. *Northwestern Nat. Ins. Co.* (1910) 157 Cal. 213 [107 P. 292], the court upheld coverage of a fire insurance policy which ''provided that the entire policy should be void 'if the subject of insurance be personal property and be or become encumbered with a chattel mortgage' '' (p. 219), despite the fact that a chattel mortgage had been ''given to secure the payment of rent.'' (P. 217.) Holding that the company had waived the provision, the court adopted the decision of the District Court of Appeal to the effect that ''It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies. It is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous—the one before us covering thirteeen pages of the transcript—and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary.'' (P. 230.)

The court points out that the exclusionary clause was not brought to the attention of the insured and that it would be

unjust to apply the unknown provision to him so that it voided his insurance. The California court quoted the Montana case of *Wright* v. *Fire Ins. Assn.* (1892) 12 Mont. 474, 485 [31 P. 87, 91, 19 L.R.A. 211], "discussing a similar provision," (p. 231) to the effect that "*No mention was made that the company would not take a risk on mortgaged property.* . . . It seems to us that it would be unjust to the insurer, as well as the assured, to put such a construction on the transaction." (Emphasis added.) The California court also states: "In *German Mut. Ins. Co.* v. *Niewedde*, 11 Ind.App. 624 [39 N.E. 534], it is held by the appellate court of Indiana that 'where application for insurance is orally made, and there are no questions asked concerning encumbrances and *the insured is unaware* that the existence of a mortgage was fatal to his insurance, the insurer will be deemed to have waived a provision for forfeiture by reason of existing encumbrances. . . .' " (Emphasis added.) The court further quoted the Indiana court, "In quite a number of cases it has been adjudged that *the failure of the company to inquire about, or call any attention to, some particular fact,* operates to relieve the insured from a forfeiture which would follow his omission to disclose it. . . ." (Emphasis added.)

Other cases involving insurance contracts take the same approach to similar factual situations. In *Coniglio* v. *Connecticut Fire Ins. Co.* (1919) 180 Cal. 596 [182 P. 275, 5 A.L.R. 805], defendant fire insurance company contended "that the policy was vitiated because there was contained among the fixtures a certain computing scale of which the plaintiff was not the sole and unconditional owner, title being vested in the vendor. . . ." (P. 597.) The court held that despite the declaration of the policy "that the interest of the insured in the property was 'fee simple' . . . there was no showing that [defendant] was or could be injured in the slightest degree by such alleged misrepresentation." (P. 599.) (See e.g., *Sharp* v. *Scottish Union etc. Co.* (1902) 136 Cal. 542 [69 P. 253, 615] ; *Brubaker* v. *Beneficial etc. Life Ins. Co.* (1955) 130 Cal.App.2d 340, 346 [278 P.2d 966] [the insurer's interpretation of the policy "would leave a gap in time in every life insurance policy, in which the beneficiaries would not be protected with insurance"] ; *Glickman* v. *New York Life Ins. Co.* (1940) 16 Cal.2d 626 [107 P.2d 252, 131 A.L.R. 1292] [in referring to the earlier case of *Kavanaugh* v. *Franklin Fire Ins. Co.*, 185 Cal. 307 [197 P. 99], the *Glickman* court points out that "the court further remarked that the tenor

of the decisions bearing upon the responsibility of the insurer in connection with the issuance of an insurance policy was to treat the policy *more as a commodity than as a contract,* and that to that end rules had been evolved which were not applicable to ordinary contracts.''] ) (P. 632; emphasis added.)

The same general principle has been applied to the standardized bank passbook. Thus in *Los Angeles Inv. Co.* v. *Home Sav. Bank* (1919) 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193], the court did not enforce a condition printed in front of a commercial passbook that the depositor was concluded as to the genuineness of endorsements on cancelled checks unless he made an objection in writing within 10 days. The court said : ''But it is evident that the statement comes in the category of 'traps for the unwary,' and before such statement can be given effect as a contract binding upon the depositor and changing in a substantial particular the relation which presumably he thought he was entering into, it must appear affirmatively that he consented and agreed to it either by being required to sign it or by having his attention particularly called to it.'' (P. 613.) Following *Home Sav. Bank* the later case of *Frankini* v. *Bank of America etc. Assn.* (1936) 12 Cal.App.2d 298 [55 P.2d 232], holds that the ''burden was on the [bank] to establish'' (p. 304) that the depositor accepted the waiver, noting that the ''provision was not called to his attention'' (p. 303) and that its rigid application ''seems like a harsh rule'' (p. 304).

The courts of this state have likewise applied the same test to exclusionary clauses in delivery sheets, warehouse receipts, and freight bills. Witkin states, ''Where the contractual terms of a delivery sheet are not obvious, they may be denied enforcement.'' (Summary of California Law, p. 42.) In striking down a limitation of liability in a warehouse receipt to $25, the court pointed out in *Wilson* v. *Crown Transfer etc. Co.* (1927) 201 Cal. 701, 714 [258 P. 596] that the warehouse bore the duty ''of bringing home to the respondents notice that the goods were accepted and held under such limited liability.'' *McQueen* v. *Tyler* (1943) 61 Cal.App.2d 263 [142 P.2d 466], notes that the carrier, relying upon such a provision in a freight bill ''must show that the shipper accepted the contract 'with a knowledge of its terms.' '' (P. 267.) In upholding findings that a disclaimer of liability in an invoice for defective paint did not bind the buyer, the court alluded to the ''finely-printed statements as to disclaimer'' and the fact that ''the provisions are so located as to easily escape atten-

tion.'' (*India Paint & Lacquer Co.* v. *United Steel Products Corp.* (1954) 123 Cal.App.2d 597, 610 [267 P.2d 408]; see also *Scott's Valley Fruit Exch.* v. *Growers Refrigeration Co., Inc.* (1947) 81 Cal.App.2d 437 [184 P.2d 183]; *May Hosiery Mills* v. *G. C. Hall & Son* (1926) 77 Cal.App. 291 [246 P. 332].)

The approach of the California courts to the exculpatory or exclusionary clause of the standardized contract finds a reflection in cases of other states and in the writings of the commentators. ▮ Indeed, some legal authorities categorize the instant contract and comparable agreements under the term ''contract of adhesion'' to give it a more definite place in the law and to emphasize the need for the strict judicial scrutiny of its terms. The term[10] refers to a standardized contract prepared entirely by one party to the transaction for the acceptance of the other; such a contract, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a ''take it or leave it'' basis, without opportunity for bargaining and under such conditions that the ''adherer'' cannot obtain the desired product or service save by acquiescing in the form agreement.[11]

---

[10]This term was first used in French legal analysis in 1901. (Salleilles, De la Declaration de Volonté 229.) It was introduced into Anglo-American Jurisprudence by Edwin W. Patterson in 1919 (Patterson, *The Delivery of a Life-Insurance Policy*, 33 Harv.L.Rev. 198, 222), and since has become common in legal writing. It is gradually finding its way into judicial opinions. (See *Siegelman* v. *Cunard White Star, Ltd.* (2d Cir. 1955) 221 F.2d 189, 204 (Frank, J., dissenting); *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690 [10 Cal.Rptr. 781]; *Bekken* v. *Equitable Life Assur. Soc.* (1940) 70 N.D. 122 [293 N.W. 200].)

[11]As Professor Kessler states, ''Standard contracts are typically used by enterprises with strong bargaining power. The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood only in a vague way, if at all.'' Kessler, *Contracts of Adhesion—Some Thoughts about Freedom of Contract*, 43 Colum. L. Rev. 629, 632 (1943). See Ehrenzweig, *Adhesion Contracts in the Conflict of Laws*, 53 Colum. L. Rev. 1072, 1075 & n. 17 (1953); Schuchman, *Consumer Credit by Adhesion Contracts*, 35 Temp. L.Q. 125, 128-129 (1962); Llewellyn, Book Review of Prausnitz, The Standardization of Commercial Contracts in English and Continental Law, 52 Harv. L. Rev. 700 (1939); Kahn-Freund, Law of Inland Transport (3d ed. 1956) 432-434; Friedmann, Law in a Changing Society (1959) 103-105; Fuller, Basic Contract Law (1947) 209-214; Macaulay, *Justice Traynor and the Law of Contracts* (1961) 13 Stan. L. Rev. 812, 857, 860.

In an exhaustive analysis of such contracts the New Jersey Supreme Court in the recent case of *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1], held void as against public policy an exculpatory provision of an express warranty that excluded claims against a dealer or manufacturer for personal injuries resulting from a defective car. The court stated the rationale of its ruling in these words: "The task of the judiciary is to administer the spirit as well as the letter of the law. On issues such as the present one, part of that burden is to protect the ordinary man against the loss of important rights through what, in effect, is the unilateral act of the manufacturer. . . . From the standpoint of the purchaser, there can be no arms length negotiating on the subject. Because his capacity for bargaining is so grossly unequal, the inexorable conclusion which follows is that he is not permitted to bargain at all. . . ." (P. 94 [161 A.2d].) The court emphasizes the requirement for an *understanding consent* of the consumer to any limitation of liability. "Basically, the reason a contracting party offering services of a public or *quasi*-public nature has been held to the requirements of fair dealing, and, when it attempts to limit its liability, of securing the understanding consent of the patron or consumer, is because members of the public generally have no other means of fulfilling the specific need represented by the contract. . . ." (P. 92 [161 A.2d].)

The instant contract presents an even stronger case than *Henningsen* for the requirement that the exclusionary clause of the contract should not be enforced in the absence of plain and clear notification to the public. The disparity in bargaining power between the insured and the insurer here is so tremendous that the insurer had adopted a means of selling policies which makes bargaining totally impossible. The purchaser lacks any opportunity to clarify ambiguous terms or to discover inconspicuous or concealed ones. He must purchase the policy before he even knows its provisions.

Because of the special dangers inherent in the mechanized selling of air travel insurance, the New York Court of Appeals has insisted that the burden of giving clear notice of noncoverage rests with the insurer. In *Lachs* v. *Fidelity & Cas. Co. of New York* (1954) *supra*, 306 N.Y. 357 [118 N.E.2d 555], an "Airline Trip Insurance" vending machine stood near a ticket counter for sales of nonscheduled flights in the airport; a smaller placard limited coverage to "any scheduled airline"; the printed policy provided for coverage for

"Civilian Scheduled Airlines." As in the instant case the insurer provided envelopes for the immediate mailing of the policy to the beneficiary. Unlike the passenger in the instant case the New York purchaser arranged for her trip to Miami on a nonscheduled flight, which subsequently crashed. The Court of Appeals held that the trial court properly denied the insurer's motion for summary judgment. The court points to the ambiguity of the term "Civilian Scheduled Airline" and to the ambiguity of the situation itself. It holds ". . . [T]he burden in such a case as this is on the defendant to establish that the words and expressions used not only are susceptible of the construction sought by defendant but that it is the only construction which may fairly be placed on them. The defendant in its large illuminated lettering and in its application could have added proper, unambiguous words or a definition or could have avoided allowing its vending machine to be placed in front of the ticket counter 'utilized by all nonscheduled airlines operating out of the Newark Airport,' thus removing the ambiguity or equivocal character of the invitation to insure, of the application for insurance and the contract of insurance itself. . . ." (P. 559 [118 N.E.2d].)

We must view the instant claim in the composite of its special and unique circumstances. To equate the bargaining table, where each clause is the subject of debate, to an automatic vending machine, which issues a policy before it can even be read, is to ignore basic distinctions. The proposition that the precedents must be viewed in the light of the imperatives of the age of the machine has become almost axiomatic. Here the age of the machine is no mere abstraction; it presents itself in the shape of an instrument for the mass distribution of standard contracts. The exclusionary clause of that contract, upon which the insurance company relies, is an unexpected one. Its application in some circumstances would be unconscionable. It is placed in an inconspicuous position in the document. In view of all these characteristics its rigid application would cast an unexpected burden upon the traveling public and would prefer formality of phrase to the reality of the transaction.

The judgment is reversed, and the cause is remanded to the trial court with directions to enter judgment for the plaintiff.

Gibson, C. J., Peters, J., and White, J.,* concurred.

*Assigned by Chairman of Judicial Council.

McCOMB, J., Dissenting.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Balthis in the opinion prepared by him for the District Court of Appeal in *Steven* v. *Fidelity & Casualty Co.* (Cal.App.) 22 Cal.Rptr. 83.

Schauer, J., concurred.

TRAYNOR, J., Dissenting.—In my opinion the policy covered travel by air only on scheduled air carriers. I find no basis for assuming that the ordinary traveler would reasonably believe that the policy covered travel on other than scheduled air carriers, and since there is no rule of law that requires defendant to cover risks it does not wish to cover, I would affirm the judgment.

Respondents' petition for a rehearing was denied January 16, 1963. Traynor, J., Schauer, J., and McComb, J., were of the opinion that the petition should be granted.