Cavanagh, J.
(dissenting). The majority holds today that an insured party’s objectively reasonable expectations are no longer relevant in determining the meaning of an insurance contract. Because I would not discard the doctrine of reasonable expectations, I must respectfully dissent.
I
The doctrine of reasonable expectations allows a court to contemplate the scope of insurance coverage anticipated by an insured party seeking benefits. Unlike the doctrine of contra preferentem, i.e., construing a document against the drafter, the reasonable-expectations doctrine is generally confined to the field of insurance law and, when correctly applied, is not limited to those circumstances in which a document is clearly ambiguous on its face.[1] *66 Rather, the doctrine may assist a court in making the ambiguity determination, i.e., whether an insurance contract contains language that could reasonably be interpreted in two or more ways.[2]
Although courts normally limit the ambiguity inquiry to the four comers of a contract’s text in other contexts, few have failed to recognize the unique character of insurance agreements:
There is no meeting of the minds except regarding the broad outlines of the transaction, the insurer’s desire to sell a policy and the insured’s desire to buy a policy of insurance for a designated price and period of insurance to cover loss arising from particular perils (death, illness, fire, theft, auto accident, “comprehensive”). The details (definitions, exceptions, exclusions, conditions) are generally not discussed and rarely negotiated. [Lotoszinski v State Farm, Mut Automobile Ins Co, 417 Mich 1, 14 n 1; 331 NW2d 467 (1982) (Levin, J., dissenting).]
See also Keeton, Insurance law rights at variance with policy provisions, 83 Harv L R 961 (1970), and cases cited therein.
Hence, in the context of such adhesion contracts, it is appropriate to consider not just the contractual text, but also the objectively reasonable expectations *67 of the insured party and the circumstances surrounding the transaction.
In Steven v Fidelity & Cas Co of NY, 58 Cal 2d 862; 27 Cal Rptr 172; 377 P2d 284 (1962), for example, appellant’s husband purchased a life-insurance policy from a vending machine before leaving on a business flight. The insured was required to sign and mail the entire document before boarding the flight. The text of the contract, which could be fully reviewed only after purchase, contained an exception, prohibiting coverage for charter flights, while permitting coverage for reasonable methods of substitute transportation by land. On the return trip, appellant’s husband was forced to make emergency arrangements on a charter flight. The insured died while traveling on the charter plane, and the insurer denied benefits.
On appeal, California’s high court refused to enforce the exclusion. The court held that a reasonable insured party would purchase such insurance expecting coverage for the entire trip, including any reasonable emergency substitute form of transportation. Because the contract did not expressly prohibit the type of substitute transportation utilized by the insured, though it did prohibit coverage for travel “on other than scheduled air carriers,” id. at 866, a lay person could not reasonably be expected to foresee the force of the exclusion. Moreover, the court emphasized that the inanimate vending machine emitted a complex document that most people would be unable to decipher before boarding a plane. Likewise, the sticker on the face of the machine prohibiting coverage for nonscheduled air carriers could not aid the purchaser in weighing the benefits of the contract because the definition was buried in its text. Id., *68 supra at 877. In support of this result, Justice Tobriner noted that “California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable.” Id. at 879, relying on Raulet v Northwestern Nat’l Ins Co, 157 Cal 213, 230; 107 P 292 (1910) (holding that insured parties would not be stringently bound to contract provisions because “[i]t is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies .... [I]n their numerous conditions and stipulations [insurance contracts] fumish[] what sometimes may be veritable traps for the unwary.”).
Recognizing these same principles, dissenting Justice Williams noted in Raska v Farm Bureau Ins Co, 412 Mich 355, 370; 314 NW2d 440 (1982):
This Court is made up of human beings who are aware that very few insureds will try to read the detailed, cross-referenced, standardized, mass-produced insurance form, nor necessarily understand it if they do. Courts generally have gradually moved away from the traditional rule of caveat emptor, realizing that the modem insurance contract is not made between parties of equal bargaining strength with each side taking a part in choosing the language of the agreement and understanding what the contract means.
Thus the approach we must take in examining insurance contracts such as the one in issue was accurately described by the New Jersey Supreme Court as follows:
“An insurance policy, though in form a contract, is a product prepared and packaged by the insurer. The buyer scarcely understands the detailed content of what he is buying. When a court construes a policy, it cannot be indifferent to that reality.” [Raska, quoting DiOrio v New Jersey Manufacturers Ins Co, 63 NJ 597, 602; 311 A2d 378 (1973).]
*69 For these reasons, I must express my agreement with Justice Levin’s approach in Lotoszinski, supra at 15-16:
It is the historic responsibility of the courts to protect, in the exercise of the judicial power, against imposition in commercial transactions. Fairness is the proper inquiry where a court is assessing policy language marketed and purchased without negotiation or explanation of the scope of the coverage.3. . .
The governing rule of law cannot rightfully be predicated on the assumption that [the plaintiff] would read the policy, that if she did read it she would or could understand its esoteric verbiage, anticipate the situation which developed and deduce that she was not covered. Many competent lawyers would, unless they set aside time for careful reading and reflection, have failed that exam.
3 See Bradley v Mid-Century Ins Co, 409 Mich 1, 61; 294 NW2d 141 (1980); DiOrio v New Jersey Manufacturers Ins Co, [supra]; C & J Fertilizer, Inc v Allied Mutual Ins Co, 227 NW2d 169, 175 (Iowa, 1975); Hionis v Northern Mutual Ins Co, 230 Pa Super 511, 516-517; 327 A2d 363, 365 (1974); Henningsen v Bloomfield Motors, Inc, 32 NJ 358, 399-400; 161 A2d 69, 92 (1960); Ady v West American Ins Co, 69 Ohio St 2d 593, 597; 433 NE2d 547, 549 (1982).
See also Keeton, Insurance Law, § 63, pp 350-351; 2 Restatement Contracts, 2d, § 208; 1 Corbin, Contracts, § 128, p 554; Grismore, Contracts (Murray), § 294, p 508.
Though few would deny that the majority has artfully attempted to diminish the significance of this Court’s jurisprudence with regard to the reasonable-expectations doctrine, it cannot be denied that, before today, Michigan joined the majority of states *70 that integrated the doctrine into their jurisprudence.[3] In doing so, such jurisdictions did nothing more than recognize our timeworn rules of contract interpretation, i.e., contract formation requires a meeting of the minds.
Though I acknowledge that the majority’s position is consistent with the notion that “free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements,” ante at 52 citing Terrien v Zwit, 467 Mich 56, 71; 648 NW2d 602 (2002), I object to its attempt to distance itself from the policy choices inherent in its decision today. Simply put, the majority and I differ with regard to the policies that should guide the interpretation of insurance law. I would prefer not to disregard the manner in which the insurance industry operates. Though an adhesion contract may be a necessary ingredient in the trade, I cannot condone a doctrine of interpretation that all but ignores the potentially precarious effect on the bound party.
II
In light of these standards, I cannot agree that the contract terms are free of ambiguity.[4] Defendant insurer based its premium for underinsured-motorist *71 coverage on a “per person” and “per occurrence” maximum. This portion of the contract, found on the declarations page, was among the few terms actually negotiated by the parties.
Even assuming the purchasing party read and understood the policy upon receipt (which often arrives weeks after the original purchase), review of the exclusions in section four suggests the insurer simply attempted to clarify that its liability was limited to making the insured whole, paying out no more than necessary to meet the limits on which the purchase price was based, i.e., $100,000 per person and $300,000 per occurrence.
If the insurer intended to limit coverage in the manner it now claims, it had a duty to expressly state not only that “coverage will not be increased,” but also that coverage may be decreased from the coverage limits specifically negotiated. Instead of acknowledging this rational deduction, defendant insurer has *72 asked this Court to pretend that both plaintiffs received the negligent party’s maximum benefit ($50,000 per person or per accident), when in fact defendant insurer had previously authorized a settlement agreement wherein the injured plaintiffs split the negligent party’s benefits, receiving only $25,000 each.
More specifically, the insurer’s inclusion of ¶ 4(l)(a)-(b) merely assures that an insured will be reimbursed up to the policy limits on the declarations page, while clarifying no windfall payments will be made, i.e., an insured will not receive duplicate reimbursement or payments exceeding the underinsured policy limits on the declarations page. Paragraph (4)(a)(l), for example, provides that an insurer will pay no more than the difference between policy limits. This clause clarifies that an insurer is simply obligated to make up the difference between benefits received from the underinsured party and the insurer. Though free of ambiguity when only one person is injured, the text’s vagueness becomes evident when multiple insured parties are injured if the negligent party’s policy has no separate per person and per occurrence coverage.
Further, the use of the term “available” is ambiguous, as noted by Justice Kelly in her dissent. While it is true in this case that the underinsured negligent motorist has $50,000 available for the total occurrence with no per person limit, it is impossible to conclude from the text of the contract at issue that the underinsured has $50,000 available to pay each plaintiff, though that is exactly the interpretation defendant asks this Court to adopt. By inserting text that ensures that payments for the same injuries are *73 not duplicated, while simultaneously asking the Court—on the basis of the vague text—to assume that one limit could be paid out more than once, defendant has convinced this Court to further shift the balance of power in favor of insurance companies for the purpose of reducing an insurer’s liability.
Properly interpreted, the computation required in ¶ 4(a)(1) should be the difference between the insurer’s per person limit ($100,000) and the underinsured’s per occurrence limit as actually received (in this case, $25,000 per plaintiff). Similarly, if it were necessary to determine the per occurrence liability, the amount purchased by the underinsured motorist ($50,000) should be deducted from the amount of per occurrence coverage purchased from the insurer ($300,000).
Paragraph 4(a) (2) also supports a ruling in favor of plaintiffs. That paragraph clarifies that an insurer will pay benefits only for damages actually incurred, i.e., if an insured is hurt by a driver with a $40,000 per person policy limit and the insured incurs $60,000 in individual damages, the insurance company need pay only $20,000, assuming an insured has purchased a $100,000 per person underinsured-motorist policy. This clause makes clear the insurer will pay benefits to make an insured whole, but no more.
Paragraphs (4)(b)(l)-(4) also clarify that an insurer’s liability will not be increased because of (1) the number of vehicles for which premiums are charged in the declaration, (2) the number of claims brought, (3) the number of people injured, or (4) the number of automobiles involved in an occurrence. On the basis of subsection (3) alone, one could logically infer that benefits should not decrease as a result of *74 the number of people injured, i.e., if an insurer indicates a benefit will not be increased just because more than one person is injured, it is also reasonable to assume an insurer will not decrease benefits for the same reason.
This conclusion is buttressed by the fact that defendant sold the underinsurance coverage for a limit of $100,000 per person and $300,000 per occurrence. This implies that at least three insured parties could be compensated up to the full per person limit if injured by an underinsured motorist. Instead, the majority has adopted an interpretation that prohibits full recovery where multiple parties are injured.
Finally, ¶ 4(c) clarifies that the benefits paid will be reduced by any amount actually “paid or payable for the same bodily injury.” Again, this subsection ensures that an insured may not receive a duplicate payment for a single injury. The text of this clause suggests the reduction will be limited to that actually paid or logically payable for one particular injury. I am persuaded that the insurer’s interpretation of its contract renders ¶ 4(c) generally superfluous and logically invalid. How can an insurer reduce benefits by any amount “payable” to two people for their injuries, where the “payable” amount—the res—cannot be paid to more than one person? The problems with the text in ¶ 4(c) echo the concerns raised with regard to ¶ 4(a)(1).
In sum, even if the insured purchaser actually reviewed the terms of the contract and all its exclusions, it would have remained impossible to anticipate the insurer’s interpretation on the basis of the text of the contract purchased. Only when read in light of the underinsured negligent party’s contract *75 could one predict the majority’s interpretation. Moreover, this interpretation ignores the significance of the sole negotiated term at issue in light of ¶ 4, which merely aims to clarify that the insured will be made whole, but no more. Therefore, in light of the manner in which the contract terms could be understood by a reasonable lay person, I would hold in favor of plaintiffs.
III
The roots of the doctrine of reasonable expectations run far deeper than the majority implies and could be properly characterized as nothing more than an overt attempt to clarify the scope of the parties’ contract. Applied in this case, I suspect even the most experienced analyst would have failed to predict the outcome affirmed by the majority. Because the inquiry merely aids in the resolution of ambiguous insurance-contract terms, I must respectfully dissent and would affirm the decision of the Court of Appeals.
Kelly, J., concurred with Cavanagh, J.

 As I noted in my dissent in Farm Bureau Mut Ins Co of Michigan v Nikkei, 460 Mich 558, 571; 596 NW2d 915 (1999), an insurance company may not benefit from employing otherwise straightforward and unambiguous terms in a manner an insured could find confusing. See also Spaulding v Morse, 322 Mass 149, 152-153; 76 NE2d 137 (1947):
Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties at the time of the execution, in the light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished. . . . [The] instrument is to be so construed as to give effect to the intent of the . . . [parties] as manifested by the words used illumined by all the attendant factors, unless inconsistent with some positive rule of law or repugnant to other terms of the instrument. An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and *66 the underlying intention . . . may be effectuated, provided it is sufficiently declared by the entire instrument. [Citations omitted.]

 See Holmes, The Theory of Legal Interpretation, 12 Harv L R 417, 418 (1899):
[W]e let in evidence of intention not to help out what theory recognizes as an uncertainty of speech, and to read what the writer meant into what he has tried but failed to say, but recognizing that he has spoken with theoretic certainty, we inquire what he meant in order to find out what he has said.

 See Nikkei, supra at 567. See also Stempel, Unmet expectations: Undue restriction of the reasonable expectations approach and the misleading mythology of judicial role, 5 Conn Ins L J 181, 191 (1998) (noting that “38 states ‘have recognized some variation of the reasonable expectations doctrine.’ ”).

 As the majority notes, the relevant portions of the insurance contract provide that Auto Owners underinsured motorist policy limit is $100,000 for each person and $300,000 for each occurrence. The policy endorsement provides as follows:
*71 4. LIMIT OF LIABILITY
a. Our Limit of Liability for Underinsured Motorist Coverage shall not exceed the lowest of:
1. the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or
2. the amount by which compensatory damages for bodily injmy exceed the total limits of those bodily injury liability bonds and policies.
b. The Limit of Liability is not increased because of the number of:
1. automobiles shown or premiums charged in the Declarations;
2. claims made or suits brought;
3. persons injured; or
4. automobiles involved in the occurrence.
c. The amount we pay will be reduced by any amount paid or payable for the same bodily injury ....